947 F.2d 787
 60 USLW 2296, 37 Cont.Cas.Fed. (CCH) P 76,208
 Daryl A. DIEBOLD; Daton L. Plumblee, Plaintiffs-Appellants,
v.
UNITED STATES of America; Attorney General of the United
States; General Thomas C. Foley; Mike Stone,
Secretary; Colbar, Inc., Defendants-Appellees.
 No. 90-5373.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 5, 1990.
Decided Oct. 15, 1991.
Rehearing and Rehearing En Banc
Denied Jan. 30, 1992.
 
 Ralph M. Mobley (argued and briefed), Elizabethtown, Ky., for plaintiffs-appellants.
 Joseph M. Whittle, U.S. Atty., James H. Barr, Asst. U.S. Atty., Louisville, Ky., Timothy Goblirsch, Ft. Knox, Ky., Miguel A. Escalera, Jr. (briefed), Dept. of Army, Office of the Judge Advocate General, Washington, D.C., Christopher J. O'Brien (argued and briefed), DAJA-LTC, Dept. of Army, Litigation Div., Arlington, Va., Lawrence L. Pedley (briefed), Pedley, Ross, Zielke, Gordinier & Porter, Louisville, Ky., Joel R. Feidelman (briefed), Alan M. Grayson (argued), Richard D. Leiberman, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., for defendants-appellees.
 Before MERRITT, Chief Judge, JONES, Circuit Judge, and WELLFORD*, Senior Circuit Judge.
 MERRITT, Chief Judge.
 
 
 1
 This case presents the jurisdictional question whether, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(2),[1] a decision by the army to "privatize" or to "contract-out" the operations of its dining halls at Fort Knox is a decision "committed to agency discretion by law." The complaint in this "wrongful privatization" case alleges that the Army miscalculated the comparative costs of in-house versus outside operation of its dining halls and therefore violated statutes and regulations governing the agency's decision to contract with a private company.
 
 
 2
 The District Court held that it had no jurisdiction because the contracting-out decision at issue was "committed to agency discretion." The Court then dismissed the plaintiffs' case. For the reasons set out below, we reverse the judgment of the District Court on the issue of jurisdiction.
 
 
 3
 The parties also raised but the District Court did not reach the question whether displaced federal employees have standing to bring a complaint challenging the contracting-out decision. Therefore we do not reach the standing issue or any issue on the merits. We remand to the District Court for further proceedings, including development of the facts and law governing standing for the plaintiffs.
 
 I. Overview
 
 4
 Because of the volume and complexity of statutes, regulations, policies, administrative decisions, and cases discussed below we summarize our conclusions at the outset.
 
 
 5
 To decide whether this dispute may be heard in federal district court, we begin with the presumption that this privatization decision, an agency action within the meaning of the APA, is reviewable under the Administrative Procedure Act unless we find that the action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action generally is considered committed to agency discretion when there is "no law to apply," S.Doc. No. 248, 79th Cong., 2d Sess. 212 (1946) (hereinafter S.Doc. No. 248), when there are no "standards, definitions, or other grants of power [that] deny or require action ... or confine an agency within limits as required by the Constitution." Id. at 275.
 
 
 6
 A complex scheme of statutes and regulations governs federal procurement decisions. Underlying all these statutes and regulations is a requirement that agencies acquire goods and services at the lowest possible cost to the taxpayer. For example, Congress has set out the specific policy directive that federal agencies pursue economy and efficiency in making procurement decisions. See Office of Federal Procurement Policy Act, as amended, 41 U.S.C. § 401 et seq. See also the Budget and Accounting Act of 1921, as amended, 31 U.S.C. § 101 et seq. Further, Congress has directed the Department of Defense ("DoD") to contract with the private sector for commercial supplies and services if the private sector can provide the supplies and services at a lower cost than the government can provide the same supplies or services. See 10 U.S.C. § 2462.
 
 
 7
 Office of Management and Budget ("OMB") Circular A-76 and its accompanying Supplement set out an elaborate, mandatory process for comparing the costs of in-house and private production. It requires an administrative appeals process to adjudicate the claims of aggrieved citizens, a process not unlike the social security appeals process. The Defense Department must follow Circular A-76 in its comparison of costs. See 32 C.F.R. §§ 169 & 169a. See also 48 C.F.R. § 7.3. In its decision whether to provide its own commercial supplies and services or whether to contract with the private sector, the Army must compare costs and choose the least costly alternative. In this regime as a whole, with its directives to procure commercial supplies and services economically and save money for the taxpayer, we find law to apply, standards which confine an agency's action in making the contracting-out decision. Wrongful privatization cases are in principle cases requiring an accounting, and courts have long dealt with disputes that required an accounting of one party or another.
 
 
 8
 Our view that these statutes and regulations provide law to apply and enable courts to review agency procurement decisions is reinforced by a number of legal developments by courts, Congress, and the Executive agencies that have developed the procurement regulations. After the enactment of the APA, courts found law to apply in procurement cases involving disappointed bidder protests. See, e.g. Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970). The law to apply in the disappointed bidder cases is precisely the same set of laws and regulations as in disappointed in-house employee cases like this one. The Government Accounting Office ("GAO") review of procurement decisions, including bid protests founded on lack of compliance with Circular A-76, illustrates that the procurement statutes and regulations create law to apply. See, e.g., Matter of: EPD Enterprises, Inc., 69 Comp.Gen. 46 (Oct. 30, 1989). Congress expressly has approved the disappointed bidder cases. See S.Rep. No. 275, 97th Cong., 2d Sess. 22-23, reprinted in 1982 U.S.Code Cong. & Admin.News 11, 32-33. Further, Congress has increased the remedial power of the Claims Court. See 28 U.S.C. § 1491(a)(3). In addition, Congress has reinforced the bid protest function of the GAO while making clear that the GAO's jurisdiction is not to be exclusive of the jurisdiction of federal district courts and the Claims Court. 31 U.S.C. §§ 3551-3556. And Congress increasingly has provided other systems that allow review of the procurement process. See, e.g., 40 U.S.C. § 759(f) (General Services Administration Board of Contract Appeals). Finally, the OMB and the Department of Defense consider the cost comparison process as set out in Circular A-76 to be mandatory and have established an administrative process for the adjudication of contracting-out decisions. All directly affected parties, including federal employees, may bring an appeal under the administrative appeals procedure. See Circular Supplement, Part I, Chapter 2, p I; 32 C.F.R. § 169a.18.
 
 
 9
 Courts of appeals cases that have held that the contracting-out process is not reviewable are not directly on point. See, e.g., Local 2855, Am. Fed'n of Gov't Employees v. United States, 602 F.2d 574 (3d Cir.1979). These cases dealt with early, less formal, and highly discretionary versions of Circular A-76, prior to the Circular's setting out mandatory criteria and prior to the Circular's promulgation under 41 U.S.C. § 401 et seq. and 31 U.S.C. § 101 et seq. The Supreme Court has not dealt with APA review of a wrongful privatization case. Thus there is no Supreme Court case on point to guide our decision. The Court has, however, narrowly defined the exception, "committed to agency discretion," to include cases involving prosecutorial discretion, Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), and cases which implicate national security, Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). Our case falls outside the parameters of such definitions of nonreviewability.
 
 
 10
 We conclude that there are standards guiding this agency action and our review of the action. Furthermore, nothing suggests that Congress does not intend judicial review of the Executive branch's exercise of the spending power. Instead, the APA provides a compelling policy decision in favor of judicial review of agency action.
 
 
 11
 II. Contracting Out Process Generally And At Fort Knox
 
 
 12
 This dispute centers on the question whether the Army will save the money it says it will save by contracting-out the dining hall operation at Fort Knox rather than continuing to operate the dining halls with civilian employees. The plaintiffs are two federal civilian employees formerly employed by the Army as food service workers at Fort Knox. They brought suit against the Army and Colbar, Inc. ("Colbar"), the private contractor awarded the contract, alleging that the Army did not include certain costs it should have included in its calculations of the cost of contracting-out the food service activity, and that if it had included these costs, the cost comparison would have failed to show the ten percent savings required as a justification for the conversion to private contract.
 
 
 13
 OMB Circular A-76 sets out a mandatory process for Executive agencies to follow when they contract-out commercial activities. Each Executive department periodically reviews its commercial activities to determine whether its own operation is the most economical provider of commercial services and supplies or whether a private contractor could provide those services and supplies more economically. Circular A-76, p 5. An agency conducting such a review develops a "performance work statement," see Circular Supplement, Part II, which analyzes the task to be done. The agency then prepares a "most efficient organization" description, see Circular Supplement, Part III, which outlines the way the work described in the "performance work statement" can be done most efficiently by the agency. The agency then does a cost estimate for the government performance. See Circular Supplement, Part IV. After arriving at its own cost estimate, the agency must compare its costs to private costs to decide whether it should contract-out a commercial service. Generally, agencies are directed to rely on private enterprise "if the product or service can be procured more economically from a commercial source." Circular A-76, p 5. In order to make this comparison the agency solicits bids from private contractors. Circular Supplement, Part IV, Chapter 1, p C. The agency then begins the comparison by selecting the best private bid. OMB's Cost Comparison Handbook, Circular Supplement, Part IV, sets out requirements for developing the estimates and comparing the agency cost with the private cost. As directed by the OMB, the agency makes various adjustments to the cost estimates. For example, the agency must adjust the private bid by adding any costs to the agency made necessary by the contract. Id. at Chapter 3, p D. The agency also must subtract from the contractor bid price the federal income tax the contractor will pay. Id. at Chapter 3, p G. Circular A-76 requires an independent review of the in-house and contract cost estimates. The Army Audit Agency does this review for Army commercial activity studies.
 
 
 14
 After adjusting the in-house and contractor calculations so as to arrive at real costs, the agency compares the in-house and contract bid figures. Then, if contracting-out will save more than ten percent of the in-house personnel related cost of doing the work internally, the agency tentatively awards the contract. The ten percent margin is added "to give consideration to the loss of productivity, the temporary decrease in efficiency and effectiveness, the cost of retained grade and pay, temporary operation of facilities at reduced capacity and other unpredictable risks that result any time a conversion is made." Id. at Chapter 4, p A. The cost margin established by Circular A-76 "must be exceeded before converting an in-house commercial activity to contract." Id. The agency makes public very detailed information on its decision, and interested parties, including employees and their unions, may appeal the cost comparison in an administrative review process. Circular Supplement, Part I, Chapter 2, p I.
 
 
 15
 The Army followed this process for evaluating whether to privatize the food service activity at Fort Knox, Kentucky. According to the narrative provided by the parties and the General Accounting Office, Fort Knox began a study of its maintenance and supply activities in 1981. In 1983 Fort Knox was authorized to study and solicit the food service activity separately from other commercial activities. Following development of a plan, Fort Knox solicited bids and did cost comparisons several times during the next several years. Interested parties contested the process. One contract award to Colbar was cancelled and bids were resolicited because a Congressional Inquiry questioned compliance with the Small Business Administration regulations. Another award to Colbar was withdrawn following a protest by a disappointed bidder filed with the GAO. The GAO sustained the protest and directed an award to the protesting bidder. A solicitation was re-issued in May 1988, resulting in a tentative award to Colbar. This award, the subject of this litigation, was supported by the Army's calculation that it could save $6 million or almost 20% over 55 months: in-house costs of $33 million as compared to $27 million on Colbar's bid.
 
 
 16
 The Union, AFGE, Local 2302, appealed the award decision in November 1988, asserting that certain costs should have been included in the Army's calculations of the cost of contracting-out. The Administrative Appeals Board denied the Union's appeal in December 1988. The Review Board accepted the Army's assertion that the costs at issue were not within the scope of the Circular A-76 process or any resulting contract.
 
 
 17
 In January 1989 the General Accounting Office received a Congressional request to study the award to Colbar. The GAO study, as more fully explained below, seemed to support the substance of the allegations in the Union appeal. In response to the GAO study the Army conducted an Inspector General investigation, concluding that the GAO study was mistaken and that even taking into account the problems raised by the GAO, the Colbar contract would save the requisite ten percent. The Under Secretary of the Army said that no more investigation was necessary and that the contract should be awarded. The decision was announced to Congress on January 2, 1990.
 
 
 18
 The central complaint leveled against the award to Colbar arose from the failure of the Army to include in the cost of contracting-out the cost of supervising recruits doing KP (now called "dining facility attendants").[2] Under the in-house system Army civilian cooks supervised the recruits at no additional cost to the Army. Under the contract with Colbar, the Army must provide supervision because Army regulations do not allow this supervision to be done by contractor personnel. This supervision issue was raised throughout the contracting-out process. Fort Knox originally included $2.9 million to cover these costs. (The GAO said this calculation was too low because it was not computed according to Circular A-76 guidelines.) The Army Audit Agency said the figures should not be included because military personnel from the Army training brigade could supervise the KP's without additional cost to the Army. Fort Knox still believed the figures should be included because the training brigade did not have the extra personnel, and in any case, this supervision cost would be an additional cost made necessary by contracting-out. The United States Army Organization and Efficiency Review Agency agreed with the Army Audit Agency. Fort Knox took the supervision cost out of its calculations of the cost for contracting-out, and the Army proceeded with the cost comparison and award.
 
 
 19
 Acting on the request of Kentucky's senators, the GAO examined the cost comparison and concluded that the supervision cost should be included in the cost of contracting-out. The GAO calculated the supervision cost to range from $4.6 million to $5.6 million, depending on whether the supervision provided was civilian, military, or a combination of these. The GAO recognized that part-time supervisors might be used, thus lowering the cost, but noted that the Army had not analyzed the Fort Knox operation so as to know whether part-time supervision might suffice in some parts of the food service operation. As part of its investigation, the GAO talked to the Efficiency Review Agency official who had said the supervision cost did not have to be included. The official said that he gave that advice based on the Army Audit Agency's assumptions, but that if additional supervisors had to be hired, the cost should be added to the cost of contracting-out.
 
 
 20
 The GAO also concluded that the Army had overstated the in-house costs and understated other costs of contracting-out, thus understating the net cost of contracting-out by an additional $1.5 million, indicating that it would be cheaper to operate the dining halls in-house. Finally, the GAO reported that supporting documentation was not available for some portions of the commercial activity review. The GAO was thus unable to evaluate those portions.
 
 
 21
 The GAO recommended that the Army reexamine the cost it projected for in-house performance and develop more realistic figures to use in a cost comparison. The GAO study further recommended that a new comparison be done with these more realistic figures and that unless the required savings could be shown, the Army should retain the food service activity in-house.
 
 
 22
 The Army re-considered its cost figures, but concluded that its own figures were valid and proceeded with the award to Colbar.
 
 
 23
 III. Federal Procurement Statutes and Regulations
 
 
 24
 The Army, an agency of the federal government for procurement purposes within the meaning of 41 U.S.C. § 403(1)(B), is governed by procurement statutes and regulations when it uses the procurement process to decide whether to produce necessary supplies and services or contract-out that production.
 
 
 25
 Two of the statutes at issue define national policy for government procurement: the Budget and Accounting Act of 1921 (the 1921 Act), as amended, 31 U.S.C. § 101 et seq., and the Office of Federal Procurement Policy Act Amendments of 1979, as amended, 41 U.S.C. § 401 et seq.[3] The OMB cites both these statutes as authority for Circular A-76 (1983 revision).[4] The 1921 Act has only a general relation to contracting-out. It established both the Bureau of Budget, the precursor of the OMB, and the General Accounting Office. See 31 U.S.C. § 501(OMB) and § 702(GAO) for current provisions. It created these offices in the interest of coordinating the budgeting process from the executive and the legislative branches. See 59 Cong.Rec. 7949 (1920) (statement of Rep. Good) (describing proposed bill as a way to eliminate overlapping and duplication in Government and to place the operation of Government "upon a business basis").
 
 
 26
 The Procurement Policy Act articulated the policy of the United States Government in procurement: "to promote economy, efficiency and effectiveness." 41 U.S.C. § 401. To carry out this policy, Congress created the Office of Federal Procurement Policy within the OMB and the position of Administrator of that Office to coordinate and oversee all federal procurement. See id. at §§ 402(b), 404. The statute describes the role of the Administrator as requiring that person to "provide overall direction of procurement policy." Id. at § 405(a). Further, the Administrator is given the power and responsibility to write government-wide procurement regulations, binding on executive agencies, if the Department of Defense ("DoD"), the National Aeronautics and Space Administration ("NASA"), and the General Services Administration ("GSA") cannot agree on or do not issue regulations. Id. at 405(b). Congress also gave the Administrator the power to rescind any procurement regulations issued by Executive agencies if those regulations are inconsistent with Congress's explicit policy decision that the Government must pursue economy and efficiency in procurement. Id. at § 405(f).
 
 
 27
 In addition to defining general national policy for government procurement, Congress addressed the specific issue of Defense Department procurement of commercial supplies and services in 10 U.S.C. § 2462. In this statute Congress set out specific standards directing the DoD to contract-out if the private sector can provide commercial services at a lower cost than the DoD cost. The statute requires a cost comparison, using "realistic and fair" cost estimates. Id. The text of that statute is set out in the note below.[5]
 
 
 28
 OMB Circular A-76, promulgated under the authority of the 1921 Act and the Procurement Policy Act, sets out explicit requirements for Executive agencies to follow in procuring supplies and services. See supra description of Circular's operation generally and at Fort Knox. The Circular describes national policy as requiring government agencies to "achieve economy and enhance productivity." p 5. The Circular then sets out the requirement that agencies perform cost comparisons unless activities have been declared governmental functions and mandates contracting-out if a commercial source can supply the goods or services more economically than an in-house operation. Id. The Circular also mandates that "[a]n existing in-house activity shall not be converted to contract performance on the basis of economy unless the projected cost advantage to the Government is at least 10 percent of the in-house personnel-related cost for the performance period." Circular Supplement, Part I, p G. The Circular requires detailed records and documentation to support all elements of the cost study. See, e.g., Circular Supplement, Part IV, p A.
 
 
 29
 The Defense Department has promulgated implementing regulations to guide the decision whether to contract-out commercial activities or retain them in-house. See Commercial Activities Program and Commercial Activities Program Procedures, 32 C.F.R. § 169 & § 169a. These regulations, written in response to OMB Circular A-76, set out Defense Department guidelines that both reiterate and incorporate Circular A-76. These regulations reflect the Congressional policy commitment of 41 U.S.C. § 401 et seq. in reciting a policy of pursuing "economy and quality through competition." 32 C.F.R. § 169.4(b). To carry out this policy commitment, the regulations provide for comparison of costs between contracting-out and in-house performance. Id. Further, the regulations provide that "DoD components shall rely on commercially available sources to provide commercial products and services" and shall not rely on in-house sources "if the products or services can be procured more economically from commercial sources." Id. at § 169.4(d). The regulations incorporate by reference Circular A-76 in directing the military departments to conduct a cost comparison between a current in-house operation and commercial sources for the operation in accordance with appropriate provisions of Circular A-76. Id. at § 169.a15(d). See also 48 C.F.R. § 7.3 (Federal Acquisition Regulation--subsection dealing with contracting-out).
 
 IV. APA Review
 
 30
 The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA further explains what actions are reviewable: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." Id. at § 704. The discussions within the legislative history concerning the APA indicate Congress's strong commitment to providing judicial review of agency action. The stated purpose of the APA was "to improve the administration of justice by prescribing fair administrative procedure, ... [to be] a bill of rights for the hundreds of thousands of Americans whose affairs are controlled or regulated in one way or another by agencies of the Federal Government." S.Doc. No. 248 at 298. It was not intended that "the Government ... be unduly restricted by the bill.... [but] [t]he committee [took] the position that the bill must reasonably protect private parties even at the risk of some incidental or possible inconvenience to, or change in, present administrative operations." Id. at 301.
 
 
 31
 This grant of the right of review is limited by the threshold provision which says that "[t]his chapter applies ... except to the extent that--(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1), (2). The legislative history makes clear that these threshold conditions cover a narrow band. As to preclusion of judicial review, the first exception, the House Report notes that withholding review is rare and says that if a statute is meant to preclude review, it either will specifically withhold review or will "upon its face give clear and convincing evidence of an intent to withhold [review]." S.Doc. No. 248 at 275. See also Senate Report, id. at 212 (describing the conditions under which review would be withheld as rare). The statutes relied upon by the plaintiffs do not address the question of judicial review. Thus the presumption that the agency action is reviewable is not weakened by any directive in the relevant statutes. The parties do not argue that there is any explicit directive that review should be precluded. Neither do they argue that on the face of any of these statutes there is "clear and convincing evidence of an intent to withhold [review]." Therefore, we must address the question of review in terms of the second exception. The House Report notes, as to the second exception, that judicial review requires "standards, definitions, or other grants of power [that] deny or require action in given situations or confine an agency within limits as required by the Constitution." Id. at 275. The absence of such standards and limits exempts agency action from judicial review. Id. The Senate Report also addresses the second exception, "committed to agency discretion by law":
 
 
 32
 The basic exception of matters committed to agency discretion would apply even if not stated at the outset. If, for example, statutes are drawn in such broad terms that in a given case there is no law to apply, courts of course have no statutory question to review.
 
 
 33
 Id. at 212.
 
 
 34
 In using these explanations of the second exception from the legislative history to frame our inquiry, we rely on the three principal Supreme Court cases elucidating the exception: Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); and Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). See infra, discussion of cases.
 
 
 35
 V. Applicability of APA in Federal Procurement Decisions
 
 
 36
 Our inquiry whether this agency decision to contract-out is "agency action ... committed to agency discretion by law" centers on whether there is "law to apply," whether there are "standards, definitions, or other grants of power [that]--confine an agency within limits."
 
 
 37
 To decide this wrongful privatization case, we look first to the general procurement statutes, then to the statute dealing with DoD contracting-out, and finally to the regulations issued pursuant to these statutes as sources of law and examine whether they create "law to apply" and provide standards against which a court may judge whether an agency has complied with applicable law.
 
 
 38
 Congress established the need for economy and efficiency early in this century in the 1921 Budget Act. 31 U.S.C. § 101 et seq. The 1974 Procurement Act, 41 U.S.C. § 401 et seq., and later amendments to the Act make clear that Congress continues to intend that there be a national commitment to economy and efficiency in procurement.[6] When the Procurement Policy Act states that it is the policy of the United States "to promote economy, efficiency and effectiveness" in procurement decisions, 41 U.S.C. § 401, this language is not general, hopeful, precatory language; it is rather specific, directional language. Congress did not leave the administration of this policy to internal agency structure. Instead, to carry out these goals Congress created an Office of Federal Procurement Policy to oversee procurement policy. Id. at § 402. Congress revisited this statute in 1979, 1983, and 1988, the last time creating continuing funding for the Office of Procurement Policy, thus reiterating the national policy commitment to economy and efficiency in procurement. Furthermore, Congress made clear that these policy objectives are measurable and enforceable by giving the Procurement Policy Administrator the power to deny promulgation of or rescind any agency regulations that are inconsistent with these objectives. Id. at § 405(f). While Congress did not authorize the Procurement Policy Administrator to interfere with an agency's determination of a need for supplies and services or with specific award actions, see id. at § 405(c), nevertheless, the policy directive to pursue economy and efficiency implicates numbers, measurement, and accountability and supplies a meaningful standard against which to evaluate an agency's exercise of discretion.
 
 
 39
 The legislative history of the Procurement Policy Act reveals this same firm and continuing commitment to the necessity for government procurement to be ruled by economy and efficiency. See H.R.Rep. No. 178, 96th Cong., 1st Sess. 1 reprinted in 1979 U.S.Code Cong. & Admin.News 1492, (noting that prior to the 1974 legislation the Commission on Government Procurement, which recommended establishing an Office of Procurement Policy, had as its chief goal bringing economy and efficiency to the government procurement process, id. at 1493; attesting to the Committee's belief that the Office could "serve a worthwhile purpose in promoting efficiency and economy in the Federal procurement process," id. at 1492; and reauthorizing the Office for three additional years, reiterating the Office's mandate to "promot[e] economy and efficiency in the procurement process," id. at 1499); S.Rep. No. 214, 98th Cong., 1st Sess. 1, reprinted in 1983 U.S.Code Cong. & Admin.News 2027 (reviewing history and purpose of the Procurement Policy Act in the 1983 reauthorization bill, reiterating the basic purpose of government procurement policy: "Although there are not direct savings associated with the establishment of an OFPP, the potential for savings as a result of the impetus the Office provides to the implementation of basic procurement reforms is almost unlimited," id. at 2031).
 
 
 40
 In 1988 Congress once more looked to the need to reauthorize the Procurement Policy Office and "found ... the need for a strong OFPP ... even greater today than it was in the early 1970's." S.Rep. No. 424, 100th Cong., 2d Sess. 4, reprinted in 1988 U.S.Code Cong. & Admin.News 5687, 5690. Noting that federal procurement had grown to a 200 billion dollar policy issue, the Senate Report re-emphasized the need for simplification and efficiency as well as the need for economy and competitive practices. Id. The Senate Report again evaluated the performance of the Procurement Policy Office as "uneven" but pointed out some of its accomplishments. Among these accomplishments:
 
 
 41
 The improvement of the Government's basic program to rely on commercial sources for the performance of commercial services. The Government's policy for reliance on commercial activities set forth in OMB Circular A-76 has been improved by OFPP over the last 4 years. The A-76 program has been incorporated into the budget review process and Executive Order 12615 was issued in November of 1987.
 
 
 42
 Id. at 5692.
 
 
 43
 Concluding that the need for strong central leadership in procurement continued, Congress permanently reauthorized the Office in 1988. See id. at 5695-96. In this reauthorization, Congress reiterated the Administrator's authority to initiate and direct procurement policy, even prescribing regulations if DoD, NASA, and GSA, the three agencies statutorily authorized to issue procurement regulations, cannot agree on or do not act to implement government-wide procurement policy. Id. at 5697. Moreover, the Committee said that while it did not "envision an Administrator asserting the authority [to prescribe regulations] without consulting the respective agencies, the Committee does intend the Administrator to have the authority to compel action on the part of the agencies if necessary." Id. at 5698.
 
 
 44
 The 1974 Procurement Policy Act and its legislative history make clear that the policy commitment to economy and efficiency are mandatory, not discretionary. In addition to creating a mandatory policy to pursue economy and efficiency in procurement in this Act, Congress dealt more specifically with the Army's obligations in the contracting-out process in 10 U.S.C. § 2462. See text of statute at note 5 supra. The language of this statutory provision is mandatory (the Secretary of Defense "shall procure" supplies and services from the private sector), and there is a standard established to guide its administration by the Army (if the private sector "can provide such supply or service to the Department at a cost that is lower ... than the cost at which the Department can provide the same supply or service"). In this legislation, Congress established a "real cost" approach by directing that the cost comparison be done "after including any cost differential required by law, Executive order, or regulation" and requiring that "all costs considered ... [must be] realistic and fair."
 
 
 45
 This statute provides standards against which to evaluate an agency's exercise of discretion. The Secretary may not contract-out as a matter of discretion nor may the decision rest on whether the Secretary deems the contract or the in-house service to cost less. Instead, the statute requires a measurable, objective comparison of costs. The statute does not contain language allowing the Secretary to omit relevant costs in determining either set of figures.
 
 
 46
 We note the degree to which this portion of the statute provides an objective standard by contrasting these provisions with a discretionary provision of this same statute. The whole of § 2462(a), mandating contracting out if that process will save money, does not apply to "functions which the Secretary of Defense determines must be performed by military or Government personnel." Here we find discretionary language: the Secretary may "determine" that some functions cannot be performed by contract. Apart from this standardless determination, Congress has required a mandatory cost-benefit analysis.
 
 
 47
 The Department of Defense regulations, "Commercial Activities Program," at 32 C.F.R. § 169, and "Commercial Activities Program Procedures," at 32 C.F.R. § 169a, are consistent with the statutory directives and create even more specific directives for DoD agencies in their contracting-out decision. These mandatory regulations, required by OMB Circular A-76, set out policy consistent with 41 U.S.C. § 401 et seq. as well as the specific directives of 10 U.S.C. § 2462, and create law to apply. In these regulations DoD agencies are directed not to "carry on any [commercial activities] to provide commercial products or services if the products or services can be procured more economically from commercial sources." § 169.4(d). Part 169a makes clear that the procedures required for commercial activities programs "are mandatory for commercial activities ... such as libraries, open messes and other morale, welfare and recreation activities." § 169a.2(c). Part 169a sets out the cost comparison process, directing DoD agencies to follow the Supplement to OMB Circular A-76 "to determine if performance by DoD employees is justified on the basis of lower cost." § 169a.15(d). The cost comparisons must comply with the requirements of Part IV of Circular A-76. § 169a.15(d)(4). The regulations require that all "significant" costs of Government and contract performance be accounted for in the cost comparison. Only "common costs," that is, those that "would be the same for either in-house or contract operation need not be computed." Id. Even in such a case, the common costs must be explained. See id. An agency may not include just the immediate costs to the agency. It must include income taxes gained or lost by the government and an allowance if contracting-out will free up resources and equipment that can be used somewhere else by the government. None of this is discretionary, and it all appears to be measurable. Read in conjunction with 41 U.S.C. § 401 et seq. and 10 U.S.C. § 2462, these regulations provide standards by which to judge an agency's contracting-out decision.
 
 
 48
 The procurement statutes and regulations create measurable standards. There remains the question whether Circular A-76 itself creates "law to apply."[7] Plaintiffs in this case and in other cases have relied on the Circular as a source of law. See, e.g., Local 2855, Am. Fed'n of Gov't Employees v. United States, 602 F.2d 574 (3d Cir.1979), and American Fed'n of Gov't Empoyees, Local 2017 v. Brown, 680 F.2d 722 (11th Cir.1982), cert. denied, 459 U.S. 1104, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983). The defendants have argued that the Circular is a mere unreviewable guideline. Courts have not been clear in their analysis whether Circular A-76 is a source of law. See Local 2855 v. United States, (first considering the 1967 version of the Circular as a source of law, but declaring that the Circular did not "provide meaningful criteria against which a court may analyze the Army's decision," 602 F.2d at 581, then suggesting in a footnote that the Circular, DoD Directives, and Army Regulations did not provide law to apply but rather provided "a loose managerial tool for implementing the government's stated policy of relying whenever possible on private concerns to supply its needs," id. at n. 28); Local 2017 v. Brown, (not considering whether Circular A-76 was itself law because the statutory provision under which plaintiffs claimed had incorporated portions of the Circular but declaring nonetheless that Circular A-76 was not a source of law).
 
 
 49
 In 1979 the GAO suggested that the Circular was not law, relying on its own earlier description of the 1967 Circular. See Matter of: ADVO-System, Inc., 58 Comp.Gen. 451 (Apr. 26, 1979) (relying on its 1967 description of the Circular as "Executive policy ... to assist the President in the formulation and administration of the fiscal program of the Government" and incorporating an even earlier description of Bureau of Budget Bulletin No. 60-2 (Sept.1959) into its description of this early version of Circular A-76 as " 'not a matter permitting of a ruling in terms of legal rights and responsibilities.' "). The Controller General indicated, however, that the versions of the Circular the opinion described were issued prior to the existence of the Procurement Policy Act and did not claim the authority of 41 U.S.C. § 405 for promulgation. Currently the GAO will not review an "agency's compliance with provisions of A-76 or internal agency regulations concerning when an activity should be the subject of a cost comparison study." Matter of: Northrop Worldwide Aircraft Services, Inc., B-243318, Apr. 12, 1991 (unpublished). The Comptroller General will, however, review a protest by a bidder "[w]here a contracting agency uses the procurement system to aid in its determination whether to contract out ... to determine if the agency conducted the cost comparison in accordance with applicable procedures." Matter of: EPD Enterprises, Inc., 69 Comp.Gen. 46 (Oct. 30, 1989).
 
 
 50
 Our research suggests that the GAO's description and the description of the Circular by the Third and Eleventh Circuits arguably applied to the Bureau of Budget Bulletins of the 1950's and the first versions of Circular A-76, issued in 1966 and revised in 1967, but that these descriptions do not apply to the current version of the Circular. Government procurement policy and the directives issued to carry out that policy in the 1950's and 1960's promoted reliance on free enterprise as a goal in itself, and Bureau of the Budget Bulletins and early versions of the Circular afforded agencies significantly more discretion than versions of the Circular after the 1979 revision.[8]
 
 
 51
 After the enactment of the Procurement Policy Act of 1974, the OMB began a gradual process of tightening the language and standards for contracting-out in Circular A-76. The 1979 revision included, for the first time, a lengthy, detailed, and specific Cost Comparison Handbook. Agencies were directed to be certain their cost comparison analyses conformed to the instructions in the Handbook. The Transmittal Memorandum (March 29, 1979) recognized an "increased emphasis on relative economy of Government and contract performance." The Circular policy statement was revised to achieve "three equally valid policy precepts": reliance on the private sector, retention of governmental functions in-house, and a directive to aim for economy supported by "rigorous" comparison of costs because "the American people deserve and expect the most economical performance." Circular A-76, p 4. This new Circular set out specific standards by which to evaluate whether savings were sufficient to convert to contract an existing in-house commercial activity: it required a savings of 10% of Government personnel cost. In-house new starts could be justified only by a 10% savings of Government personnel costs and a savings of 25% of the cost of ownership of equipment and facilities. Circular A-76, p 9c(d)(e). The Circular also mandated that each agency was to "promulgate this Circular, with the minimum necessary internal instructions." Circular A-76, p 10a(3). Finally, the Circular directed that "[n]o executive agency will engage in or contract for commercial or industrial activities except in accordance with the provisions of this Circular, or as otherwise provided by law." Circular A-76, p 6. The Circular was accompanied by Attachment B, a flow chart diagraming the specific requirements for implementing the Circular. This Circular represented a marked change from the earlier Bureau of Budget Bulletins and the early versions of the Circular. Agencies still retained discretion in defining their need, in defining the work to be done, and in designing the most efficient way to do the work. Their discretion was sharply limited, however, in the method by which to do the cost comparison and the standards set out by which to measure sufficient cost savings. Nevertheless, even with its extraordinary level of detailed directive, this Circular did not claim the authority of any statute for its promulgation. The increased emphasis on economy and the mandatory character of the cost comparison process reflected in the 1979 version resulted from a comprehensive review of the Circular begun in 1977. See Transmittal Memorandum (March 29, 1979) (noting the comprehensive review begun in 1977). This review and revision are consistent with the policy statement made by Congress in enacting the Procurement Policy Act in 1974.
 
 
 52
 Nevertheless, it was not until the 1983 revision that the Circular was promulgated under statutory authority: the Budget Act of 1921 and the Office of Procurement Policy Act Amendments of 1979. Circular A-76, p 3. The 1983 revision, therefore, carries out the objectives of both the legislative and the executive branches in their commitment to saving money in government procurement. This 1983 revision, the current version of the Circular, is quite similar to the 1979 revision. It continues to allow agencies discretion to determine the scope of the work to be done in the performance work statement and the elements of the tasks to be performed, but this discretion does not extend to the accounting and cost comparison process. This version reflects an even clearer commitment to economy and efficiency than the 1979 version. The policy statement is still described in terms of three goals. However, the statement lists the need to achieve economy and efficiency first. Moreover, while the statement includes as a goal reliance on the commercial sector, that reliance is qualified by the requirement that the commercial source must be more economical than a government source to justify the reliance. Circular A-76, p 5. The current version of the Circular therefore does not prefer private enterprise unless private enterprise can save money for the government. The Circular mandates a cost comparison for all activities and requires accounting for all costs. It continues to require a contract savings of ten percent of Government personnel costs for a conversion to contract. Circular Supplement, Part I, p G. The current version of the Circular, in its cost comparison elements, deals in measurable components. It does not leave to the discretion of the agency whether to do a cost comparison if contracting-out is proposed. Its ten percent savings for conversion is not a mere guideline.
 
 
 53
 Congress implicitly has approved and even specifically mandated that the Defense Department follow Circular A-76 in its contracting-out process. In a series of provisions codified at 10 U.S.C. §§ 2461-2468 and appearing under the heading "Contracting For Performance of Civilian Commercial or Industrial Type Functions," Congress directs the Department of Defense contracting-out process in the context of Circular A-76. We have already examined § 2462 which mandates contracting out, after inclusion of cost differentials required by law or regulation, if contracting-out will save money. This provision appears to presume the existence of Circular A-76, which is the source of adjustments to be made to in-house and contract costs in the cost comparison. In addition, Congress directs in § 2461 that the DoD give notice to Congress and make certain reports prior to conversion from in-house production to contract. This provision specifically requires a detailed summary of the cost comparison study which shows that the Government will save money by contracting-out and certification that the in-house estimate is based on the most efficient organization design. This provision tracks the requirements of Circular A-76. See also § 2463 (requiring reports on savings or costs from certain conversions to in-house performance). In § 2464 Congress specifically exempts "core logistics functions" from the Circular A-76 process, absent a waiver from the Secretary of Defense. This provision directly references Circular A-76. Similarly, § 2467 sets out requirements for taking into account certain costs for the in-house and contractor cost analysis in the Circular A-76 cost comparison, again directly incorporating Circular A-76 or any successor regulation controlling the contracting-out process. See also § 2468 (setting out authority of base commanders in relation to the Circular A-76 process).
 
 
 54
 The Circular thus has evolved from mere internal Executive department policy into a set of mandatory regulations. The current version, along with its derivative agency regulations, responds to specific statutory command to pursue economy and efficiency in federal agency procurement, and carries the force of law as far as the agencies are concerned. It can even be argued that Congress has elevated the Circular or its successor to "law" status by presuming its operation and legislating in its context. Alternatively it can be argued that at the point the Circular A-76 process involves use of the procurement process, the A-76 requirements are elevated to the status of enforceable regulations. We are not called on to say whether the Circular, standing alone, would be sufficient as a source of law, but it is clear that in the context of the whole regime of statutes and regulations governing this dispute, the Circular functions as part of the law to apply. Compliance or lack of compliance with its directives is evidence of compliance or the lack thereof with the statutory directives in 41 U.S.C. § 401 et seq. and 10 U.S.C. § 2462. Thus, evidence that an agency did not follow Circular A-76 cost calculation directives, that it did not include all costs made necessary by contracting-out, and that the agency will not save the ten percent required to justify the contracting-out decision could support a claim that the agency was not complying with statutory directives--to pursue economy and efficiency and to contract-out commercial activities if contracting-out will cost less than in-house production--the law to be applied.
 
 
 55
 VI. Legal Developments Leading to Review of Procurement Process
 
 
 56
 Our view that these statutes and regulations create law to apply and enable courts to review agency procurement decisions is reinforced by a number of legal developments by courts, Congress, and the Executive agencies that have developed the procurement regulations.
 
 
 57
 A. Disappointed Bidder Cases--Federal District Courts
 
 
 58
 After Congress enacted the APA, federal courts of appeals began to recognize standing and jurisdiction in disappointed bidder cases, thus allowing disappointed bidders to complain of arbitrary action by government agencies in the context of procurement statutes. The seminal case, Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970), allowed a disappointed bidder to challenge the Federal Aviation Administration's letting of a contract for instrument landing systems. The Court did not address directly the question of jurisdiction. Nevertheless, the Court found law to apply, after considering whether the letting of the contract was "committed to agency discretion" under 5 U.S.C. § 701(a)(2), in FAA regulations and in procurement regulations set out in 41 C.F.R. §§ 1-2.301(a) and 1-2.404-2(a) (1969). The Court cited Paul v. United States, 371 U.S. 245, 255, 83 S.Ct. 426, 433, 9 L.Ed.2d 292 (1963), for the proposition that federal procurement regulations have "the force of law." 424 F.2d at 874. In B.K. Instrument, Inc. v. United States, 715 F.2d 713 (2d Cir.1983), the Court considered a disappointed bidder challenge to an Army decision not to allow the bidder to amend its bid so as to show that it fit the description of a small business. The Court found jurisdiction and law to apply in § 724 of the Defense Appropriations Act of 1981 and regulations set out in 32 C.F.R. § 2.31 (providing for correction of apparent clerical mistakes). The plaintiffs challenged the Army's refusal to allow amendment as arbitrary, capricious, and without substantial basis under 32 C.F.R. § 2:41 (1982).
 
 
 59
 Other disappointed bidder cases come down on the same side, concluding that procurement statutes and regulations are a source of law to apply. In Choctaw Manufacturing Co. v. United States, 761 F.2d 609 (11th Cir.1985), the Court considered a disappointed bidder's challenge to an award made under a Small Business set aside to a company that did not meet Small Business qualifications. The Court found jurisdiction under 28 U.S.C. § 1331, the dispute "arising under the Armed Services Procurement Act, the Small Business Act, and the regulations promulgated thereunder." 761 F.2d at 615. The Court then applied the law as set out in these statutes and regulations. In Hayes International Corp. v. McLucas, 509 F.2d 247 (5th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975), a disappointed bidder challenged a government contract as violating Department of Defense regulations on conflicts of interest in federal procurement, 32 C.F.R. § 1-113.2 and Part 141 (1971). The Court treated these regulations as governing law but found that they did not control the case before it. These cases and other disappointed bidder cases support the proposition that the procurement statutes and regulations function as a source of law for APA review and create "law to apply."
 
 
 60
 Of particular interest is CC Distributors, Inc. v. United States, 883 F.2d 146 (D.C.Cir.1989). The D.C. Circuit considered a disappointed bidder challenge to an Air Force decision to convert the civil engineer supply stores to in-house operation without following the Circular A-76 cost comparison process.[9] The Court held that the Part 169 regulations "incorporate standards susceptible to judicial review." 883 F.2d at 154. The Court pointed out that the regulations require that a number of questions be asked: "Is a 'satisfactory' commercial source 'available'? Was a cost comparison done? Is the commercial source 'more economical' than in-house provision?" Id.
 
 
 61
 If CC Distributors and similar cases are good law, it is irrational to say that these procurement regulations provide law to apply for some plaintiffs--disappointed bidders--and not for others. The procurement statutes and regulations either provide law to apply or they do not. Whether particular plaintiffs may have the benefit of the standards set forth in particular statutes and regulations is a standing inquiry. The inquiry whether the action is committed to agency discretion by law should result in the same answer for all plaintiffs who show the existence of standards which apply to their case.
 
 
 62
 In fact, the plaintiffs in the case before us have a stronger argument for the existence of standards to guide a court's inquiry than did the plaintiffs in CC Distributors. The plaintiffs in our case are able to point to standards in the mandatory sections of the same statute relied on by CC Distributors and in very detailed portions of the same set of regulations whereas the plaintiffs in CC Distributors could find standards only in the regulations because the company relied on the discretionary portion of the statute.
 
 
 63
 This development allowing disappointed bidders to challenge government agency actions under the procurement statutes and regulations represents some change from prior law. Before the enactment of the APA and before developing its modern doctrine of standing, the Supreme Court considered a case similar to a disappointed bidder case and denied standing. See Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). The Court in Lukens Steel did not allow iron and steel producers involved in contracts with the Government to enjoin the operation of a decision of the Secretary of Labor which affected the wages they had to pay employees producing goods for government contracts. The Court denied the plaintiffs standing on the basis that their legal rights had not been invaded and declared that the Public Contracts Act and amendments were not enacted for the protection of the sellers. 310 U.S. at 126, 60 S.Ct. at 876. The Court considered the whole area of government procurement to be a matter left to the Executive branch. Id. at 127, 60 S.Ct. at 877.
 
 
 64
 Judge Friendly's decision in B.K. Instrument, Inc. v. United States, 715 F.2d 713 (2d Cir.1983), is particularly thorough in its discussion of the change wrought by the APA in the context of a disappointed bidder claim under procurement statutes. He noted that "developments in the law of standing since 1940 have deprived the Lukens case ... of precedential value" in a disappointed bidder case. 715 F.2d at 717. Enactment of the APA "had inevitable implications for Lukens, although these were slow in manifesting themselves." Id. at 718. Judge Friendly examined the D.C. Circuit's opinion in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970), and noted that it allowed a challenge to arbitrary and capricious action by the government under procurement statutes. Id.[10]
 
 
 65
 In B.K. Instrument, Judge Friendly also pointed out that Congress has recognized the jurisdiction of federal district courts to hear disappointed bidder cases under the APA. He cited the legislative history of the provision of the Federal Courts Improvement Act which established the Claims Court, 28 U.S.C. § 1491(a)(3), see infra, as illustrating that Congress intends that disappointed bidders be able to bring actions in district courts under the procurement statutes. Id. at 722. Judge Friendly's acknowledgment of Congressional intent to have procurement statutes be enforced with the aid of judicial review suggests that the policy the Supreme Court articulated in 1940, which would leave procurement matters to the discretion of the Executive branch, has been modified in the subsequent fifty years.
 
 
 66
 Although the enactment of the APA and the development of the disappointed bidder cases appear to have modified the law surrounding the bringing of a complaint under the procurement statutes, Lukens Steel continues to provide valuable guidance concerning the primary purpose of the procurement laws. As the Court noted in Lukens Steel, these statutes were enacted primarily for the protection and benefit of the United States. This policy statement of purpose continues to affect the remedy available to disappointed bidders. The D.C. Circuit has recognized that in government contracting, the "award procedures established by legislation and regulation [are designed] ... to produce the best possible contracts for the government in the majority of cases." Delta Data Systems Corp. v. Webster, 744 F.2d 197, 206 (D.C.Cir.1984) (citing Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940)). The D.C. Circuit went on to explain that its objective in "framing a remedy is to assure that the government obtains the most advantageous contracts by complying with the procedures which Congress and applicable regulations have provided." Id. While giving the disappointed bidder its original expectations generally may be the best remedy, if that remedy will cost the government more than it will benefit the government, the Court will look to other remedies. See id. at 206-07. In some cases it may not be possible for a court to give complete relief even if the bidder establishes its case. Id. at 207. A court may also consider awarding damages under a reliance theory. Id. In addition, courts have been careful to consider the possible detriment to the national interest before granting an injunction in a procurement challenge. See Hayes International Corp. v. McLucas, 509 F.2d 247, 256-58 (5th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975). Congress has affirmed this judicial reluctance to enjoin contract awards, recognizing that "courts ordinarily refrain from interference with the procurement process by declining to enjoin the Government from awarding a contract." S.Rep. No. 275, 97th Cong., 2d Sess. 23, reprinted in 1982 U.S.Code Cong. & Admin.News 11, 33.
 
 
 67
 B. Disappointed Bidder Cases--Comptroller General Review
 
 
 68
 The bid protests heard by the Comptroller General are instructive on the issue of law to apply in contracting-out cases and add to our conviction that the procurement statutes and regulations provide standards by which a court can evaluate agency action. Comptroller General opinions, while not of precedential effect, illustrate that the contracting-out process, governed by Circular A-76 and agency regulations promulgated thereunder, involves standards that a court can apply.[11] The GAO reviews bid protests "[w]here a contracting agency uses the procurement system to aid in its determination whether to contract-out." Matter of: EPD Enterprises, Inc., 69 Comp.Gen. 46 (Oct. 30, 1989). The GAO will sustain the protest only if the bidder can show "that the agency failed to follow established procedures ... [and] that this failure could have materially affected the outcome of the cost comparison." Id. In EPD the Comptroller General cited the Cost Comparison Handbook as requiring "that all significant and measurable costs ... [including those] costs resulting from unusual or special circumstances" be included in the government's internal cost estimate. The Comptroller General denied the protest, however, because the Marine Corps' proration of certain costs was not precluded by the Cost Comparison Handbook and was not shown to be inaccurate. In Matter of: DynCorp, B-233727.2 (June 9, 1989) (unpublished), the Comptroller General sustained a protest on the basis that the Air Force had not included all costs necessary for in-house performance and had misled the bidder with regard to inclusion of an additional position. The Comptroller General found that "the Air Force should have followed the Handbook and its own implementing regulations, in performing the cost comparison." See also Matter of: PSC, Inc., B-236004 (Oct. 26, 1989) (unpublished) (reviewing and affirming, as in accordance with the Cost Comparison Handbook, an agency decision not to include in its in-house cost estimate certain personnel costs because those costs would be necessary whether or not the agency contracted-out); Matter of: Department of the Navy--Request for Reconsideration, B-228931.2 (Apr. 7, 1988) (unpublished) (affirming decision in favor of bidder on issue that Navy failed to include in its in-house estimate certain costs included by bidder so that agency and bidder cost estimates were not based on same work); Matter of: Aspen Systems Corporation, B-228590 (Feb. 18, 1988) (unpublished) (holding that cost comparison was invalid because government did not include in its estimate the costs for a position required in the performance work statement); Matter of: Department of the Navy--Request for Advanced Decision, Holmes & Narver Services, Inc., 68 Comp.Gen. 3 (Oct. 4, 1988) (holding that agency's determination that bidder was non-responsible was unreasonable because "a below-cost bid in an A-76 cost comparison procurement is not a legal impediment to award so long as the bidder is found otherwise responsible"); Matter of: Contract Services Co., Inc., B-231539 (Sept. 15, 1988) (unpublished) (holding, under a "reasonable basis" test, that agency's choice of tax code from Cost Comparison Handbook table by which to calculate the bidder's federal income tax deduction for purposes of the A-76 cost comparison was unreasonable).
 
 
 69
 C. Widened Access to Challenge Procurement Decisions
 
 
 70
 Our inquiry centers on a search for Congressional intent as to judicial review. Because we find standards to apply in review of the contracting-out process and because the APA is a powerful policy decision in favor of judicial review of agency action, we are compelled to find agency action reviewable unless Congress has made a strong policy statement that it does not intend judicial review of procurement statutes which direct the Executive branch in its exercise of the spending power. Far from removing the procurement process from judicial review, Congress increasingly has widened access to fora allowing complaint that agencies have failed to follow procurement statutes and regulations.
 
 
 71
 In 1982 Congress enacted the Federal Courts Improvement Act, including a provision which changed the Court of Claims to the United States Claims Court and gave this Court new powers. See 28 U.S.C. § 1491. The Claims Court may grant declaratory judgments and give equitable relief in cases before it. It may now give such relief in pre-award contract actions. See id. at § 1491(a)(3). The aim of creating this new remedial power was to allow the Claims Court to give complete relief to litigants who bring contract actions against the government. See S.Rep. No. 275, 97th Cong., 2d Sess. 22, reprinted in 1982 U.S.Code Cong. & Admin.News 11, 32. In giving the Claims Court broad remedial power, both the House and Senate declared in their Reports that they did not intend to displace the power of federal district courts to hear complaints of illegal agency action brought under the APA. Congress cited Scanwell Laboratories Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970), the seminal disappointed bidder case, as an example of actions it did not intend to displace. See id.; H.R.Rep. No. 312, 97th Cong., 1st Sess. 43 (1981).
 
 
 72
 In addition, Congress has enacted or amended a number of statutes that provide a forum for those who wish to bring complaints under various procurement statutes, suggesting that Congress consistently has made the policy decision that the procurement statutes must be enforced, sometimes outside the Executive branch. Particularly noteworthy is the system Congress set up to provide for review of bid protests by the GAO. See 31 U.S.C. §§ 3551-3556. Congress strengthened this protest mechanism by giving the Comptroller General authority to subpoena records from both the agency and the contractor. See 31 U.S.C. § 716. In providing this system of review, Congress made clear that this remedy was not to exclude the ability of the parties to bring actions in United States district courts or the United States Claims Court: "This subchapter does not give the Comptroller General exclusive jurisdiction over protests, and nothing contained in this subchapter shall affect the right of any interested party to file a protest with the contracting agency or to file an action in a district court of the United States or the United States Claims Court." 31 U.S.C. § 3556.
 
 
 73
 In widening the remedial power of the Claims Court and strengthening the jurisdiction of the GAO, Congress has followed a continuing pattern of increasing access to review of the procurement process. Reinforcing this pattern are the levels of review available at the agency level. See, e.g., 40 U.S.C. § 759(f) (setting out the power of the General Services Administration Board of Contract Appeals to hear protests involving procurement of Automatic Data Processing hardware and software with decisions appealable to the Court of Appeals for the Federal Circuit); 41 U.S.C. § 607 (setting out the authority of agency Boards of Contract Appeals to decide appeals from decisions of contracting officers with power to grant relief that would be available in the United States Claims Court, and providing for appeal from decision to the Court of Appeals for the Federal Circuit). In light of all these developments it seems clear that Congress has not exempted the procurement process from judicial review.
 
 D. Administrative Appeals Process
 
 74
 The administrative appeals process is set up as "an administrative safeguard to ensure that agency decisions are fair and equitable and in accordance with [prescribed] procedures." See Circular Supplement, Part I, Chapter 2, p I; 32 C.F.R. § 169a.18. This appeals procedure must be "independent and objective" and the decision must be "made by an impartial official." Id. The agency must supply "detailed documentation supporting the initial cost comparison ... to directly affected parties upon request." Id. The appeal procedure "is intended to protect the rights of all directly affected parties--Federal employees and their representative organizations, and bidders or offerors on the instant solicitation." Id. Agencies are required to provide only one level of administrative review, and "the appeal decision shall be final." Id. The appeal procedure does not itself purport to "authorize an appeal outside the agency or a judicial review." Id.
 
 
 75
 This review procedure, written in administrative review language, fits well within the tradition of the Administrative Procedure Act. It provides for fairness and equity. It protects the rights of all directly affected parties. It seeks to be independent and objective. It provides for final agency action. While the review procedure does not purport to create a private right of action, it does not, as has been argued, interfere with an individual's right of action, created by the APA, to seek review of final agency action.[12]
 
 
 76
 The fact that there are multiple levels of review of contracting-out decisions--all purporting to apply definite standards and rules--suggests that there is "law to apply" for federal district courts as well. As in many other areas of multiple levels of review, some of which are more complex than procurement statutes (e.g. Social Security and Black Lung disability claims), the courts would look to see if the administrative decision is supported by substantial evidence and is not arbitrary and capricious.
 
 
 77
 VII. Case Law--Procurement Statutes and Regulations
 
 
 78
 Two earlier courts of appeals decisions have not found law to apply in contracting-out cases under procurement statutes and regulations. Local 2855, Am. Fed'n of Gov't Employees v. United States, 602 F.2d 574 (3d Cir.1979), and American Fed'n of Gov't Employees, Local 2017 v. Brown, 680 F.2d 722 (11th Cir.1982), cert. denied, 459 U.S. 1104, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983). In the absence of other precedent the District Court below naturally relied on these two cases in coming to its decision that a contracting-out decision was "committed to agency discretion by law." The analysis in these cases is not applicable to the case before us, however, because upon close inspection it is clear that the two cases apply the old loose and incomplete version of Circular A-76, prior to its revision. Thus neither these cases nor the cases cited therein persuade us to take the view that contracting out, under current law, is committed to agency discretion.
 
 
 79
 In Local 2855 the plaintiffs asked the Court to review an Army decision to contract-out stevedoring and terminal services. They asserted that the Army had based its decision to contract-out on faulty cost analysis studies, and that if the studies had been legitimate, the Army would have found that the in-house provision of services would cost less than the contract was expected to cost. The GAO said the Army's standards and audit techniques were "acceptable." 602 F.2d at 577 n. 2. The Court described Circular A-76 (1967 revision) as providing no standards by which to evaluate agency decisions. The Court pointed to the fact that the old Circular itself said that "[n]o specific standard or guideline is prescribed for deciding whether savings are sufficient to justify continuation of an existing Government commercial activity." Id. at 581. The Court noted that the "scales are weighted heavily against continuation of in-house operations," and that while contracting-out did not have to be justified, retaining an operation in-house required a "compelling reason." Id. at 581-82. Finally, the Court pointed out that the Army was allowed to consider non-cost elements such as flexibility to adjust workload and to shift workers to other areas. Id. at 582. The Court believed the Circular and regulations were a "loose managerial tool for implementing the government's stated policy of relying whenever possible on private concerns to supply its needs." Id. at n. 28. The Eleventh Circuit, in AFGE, Local 2017 v. Brown, simply cited and applied the Third Circuit's reasoning.
 
 
 80
 These cases are not helpful in the analysis of the problem before us because they describe an earlier version of Circular A-76 than the one involved in our case. As we have pointed out, see supra, discussion contrasting current Circular and early Bureau of Budget Bulletins and Circulars, federal procurement policy in the 1950's and 1960's promoted procurement from private enterprise even in the face of cost disadvantage to the Government. In addition, agencies were given wide discretion in making procurement decisions. Because the current Circular is issued under 31 U.S.C. § 101 et seq. and 41 U.S.C. § 401 et seq., because it pays considerably more attention to cost analysis and economy than early policy statements, and because its requirements are not mere guidelines but rather mandatory regulations, cases which describe the early Bureau of Budget Bulletins and early versions of the Circular as internal management policy are not conclusive of questions which arise under the current Circular.
 
 
 81
 The Third and Eleventh Circuit analysis in these cases is not applicable to the case before us for a second reason. Both Courts looked to whether the agency itself is an agency which often exercises great discretion, rather than focusing on whether the statute under examination provides standards by which the agency is to guide its action. Both Courts gave great weight to the fact that the Army was the agency involved. Both emphasized the degree to which courts are not to interfere in military affairs.[13] Both decisions reflect a choice to exercise judicial discretion not to adjudicate certain kinds of cases. This kind of analysis represents a broad prudential and policy inquiry rather than a close inquiry into whether Congress intended the agency action in question to fall into that narrow band of agency actions committed to agency discretion with no law to apply.
 
 
 82
 It is clear from the APA and its legislative history that such sweeping deference to the Army is not in keeping with the statute. The APA applies to all agencies; none is exempt. The military departments are included except when "military authority [is] exercised in the field in time of war or in occupied territory." See 5 U.S.C. § 701(b)(1). Moreover, the legislative history reiterates this point as a strength of the statute, pointing out that the statute covers all agencies but excludes some functions: "[C]ertain war and defense functions are exempted under the bill, but there is no exemption of the War or Navy departments in the performance of their other functions." S.Doc. No. 248 at 302. Thus the appropriate analysis is not as to the type of agency but the kind of function at issue. This case involves a commercial activity. The very fact that the Army has classified the activity as commercial rather than as a governmental activity suggests a lessening of the deference owed to military as military. Moreover, when the service is one such as food service or garbage pick up, the function begins to look far removed from those requiring great deference. Perhaps because the Eleventh and Third Circuits were inclined to be deferential to the Army, they cast the contracting-out decisions as though these decisions involved only discretionary matters, rather than the actual cost calculation questions which appeared to have been raised.[14]
 
 
 83
 The Supreme Court has not had occasion to consider a wrongful privatization case under the APA. The Court has explicated the exception, "committed to agency discretion" in three principal cases, none of which are on point: Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); and Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). Close attention to these cases reveals the accuracy of the Court's statement in Heckler v. Chaney that this exception to APA review "remains a narrow one." 470 U.S. at 838, 105 S.Ct. at 1659 [citation omitted]. Overton Park drew attention to the legislative history's explanation of the exception: it "is applicable ... [when] 'there is no law to apply.' " 401 U.S. at 410, 91 S.Ct. at 821 [citation omitted]. There the Court found reviewable a decision by the Secretary of Transportation to approve a road through a park, under the language directing the Secretary not to approve such a route unless there was " 'no feasible and prudent alternative.' " Id. at 411, 91 S.Ct. at 821 [citation omitted]. The Court rejected any argument which suggested that the word prudent widened the Secretary's discretion, making the discretion standardless. Id. at 411-12, 91 S.Ct. at 821.
 
 
 84
 The two decisions which found agency action unreviewable because committed to agency discretion by law dealt with special situations--prosecutorial discretion and national security. In Heckler v. Chaney, as in other prosecutorial discretion cases, the Court found unreviewable a decision by the Food and Drug Administration not to take investigative and enforcement action at the behest of prisoners convicted of capital offenses who wished the FDA to prevent the use of certain drugs as lethal injections. The Court decided that Congress did not intend "to circumscribe agency enforcement discretion" and had not "provided meaningful standards for defining the limits of that discretion." 470 U.S. at 834-38, 105 S.Ct. at 1657-59. Webster v. Doe involved a decision by the CIA director to terminate an employee under a statute written in highly discretionary language and implicating national security. The Court examined whether the CIA Director's decision to discharge a CIA employee under § 102(c) of the National Security Act of 1947, 50 U.S.C. § 403(c), was judicially reviewable. Because the Director could terminate the employment of any officer or employee if the Director " 'deem[ed] such termination necessary or advisable in the interests of the United States,' " the Court declared that the statutory language "fairly exude[d] deference to the Director, and appear[ed] ... to foreclose the application of any meaningful judicial standard of review." 486 U.S. at 600, 108 S.Ct. at 2052. In addition to examining the language of the statute, the Court looked to its structure which also indicated a Congressional intent to vest the Director with large discretion. Id. at 600-01, 108 S.Ct. at 2052.[15] In sum, the Supreme Court has made clear in these cases that the "committed to agency discretion" exception to judicial review of agency action is narrow, but these cases do not address the kind of question presented in wrongful privatization cases.
 
 VIII. Conclusion
 
 85
 These wrongful privatization cases under procurement statues and regulations like Circular A-76 are basically accounting cases. Courts have long dealt with disputes that required an accounting of one party or the other. Otherwise the cases are like other administrative review cases. The delay, judicial expertise, and floodgates arguments are no more persuasive here than in other cases. Congress made a policy decision that agency action generally should be reviewable.
 
 
 86
 Faulty cost comparisons, whether favoring bidders or in-house estimates, are contrary to the legislation governing procurement decisions. Both contribute to growing government cost. The procurement statutes are not "blank checks drawn to the credit of some administrative officer or board." S.Doc. No. 248 at 275. They are instead directives which protect "the American people [who] deserve and expect the most economical performance" in the provision of goods and services to the Government. Circular A-76, p 4 (1979 revision).
 
 
 87
 We have examined the statutes and regulations governing the contracting-out process and have found detailed standards to guide the Army in its privatization decisions. "Plainly, there is 'law to apply,' " Overton Park, 401 U.S. at 413, 91 S.Ct. at 822, and there is a "strong presumption that Congress intends judicial review of administrative action." Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986). We find no evidence that Congress intended to commit specific privatization decisions or the procurement process generally to agency discretion. What therefore remains is the compelling policy decision Congress made when it enacted the Administrative Procedure Act: "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," 5 U.S.C. § 702, and "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." Id. at § 704. We therefore hold that the contracting-out decision in this wrongful privatization case is reviewable in a federal district court under the APA. We reverse the judgment of the District Court in its dismissal for lack of jurisdiction. We remand to the District Court for further proceedings including the development of the facts and law governing standing for these plaintiffs.[16]
 
 WELLFORD, Senior Circuit Judge, dissenting:
 
 88
 Because I am convinced that Judge Charles M. Allen was correct in his memorandum opinion in this case on agency discretion, I would affirm the dismissal of this action. It was brought by two employees of "Logistics, Food Service Division, Fort Knox, Kentucky," to set aside a decision of the government agency at Fort Knox to contract food services to a private successful bidder. I dissent from the majority view for a number of reasons.
 
 
 89
 The substance of the district court's opinion is set out in the last paragraph:
 
 
 90
 While the Sixth Circuit has not ruled on this issue, we note the complete unanimity of opinion among the courts that have had occasion to address the question. We are particularly persuaded by the careful statutory and regulatory analysis in Local 2855 [v. United States, 602 F.2d 574 (3d Cir.1979) ]. We conclude that the contracting-out decision requires the exercise of considerable expertise, and there are no precise standards for assessing the varying circumstances involved in such decisions.
 
 I. STANDING
 
 91
 While I find no error in the district court's conclusions that the agency decision involved was committed to its discretion and therefore not appealable, I would first address the standing question. Another court has addressed this question and has come to the conclusion that employees, such as the two plaintiffs here, are not disappointed bidders and have no standing to contest the final agency decision in this type of situation.
 
 
 92
 Nothing in the legislative history of the 1921 [Budget and Accounting] Act suggests that Congress contemplated the protection of employment of federal employees. Indeed, Representative Good's presentation of the 1921 Act to the 67th Congress suggests a congressional purpose inconsistent with those interests. That is, the Act would require that some federal employees be terminated under the new budgeting process.
 
 
 93
 National Federation of Federal Employees v. Cheney, 883 F.2d 1038, 1046 (D.C.Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990).
 
 
 94
 I find the following language from Cheney to be a correct statement of the law on the standing of plaintiffs:
 
 
 95
 In the present case, the legislative history of the Budget and Accounting Act of 1921, as amended, leads us to conclude that Congress did not contemplate in-house federal employees and federal employee labor unions as plaintiffs. Congress carefully crafted a two-pronged checks and balances budgeting process to coordinate the United States budgeting process, eliminate duplication of services, and promote efficiency. Congress knew that some federal employees would be adversely affected and, instead of giving these employees some recourse, intentionally removed the director of the Bureau of Budget from as much external pressure as possible so that he could make the "hard" decision to reduce the employee force where necessary. At most, federal employees' interests are marginally related to this centralized annual budgeting process balanced between the Executive and Legislative branches.
 
 Cheney, 883 F.2d at 1048.[1]
 
 96
 In Cheney, however, the court based its decision on agency discretion rather than on standing. In the course of its decision, the D.C. Circuit noted that plaintiffs have no more claim to standing to challenge the agency action here than did the taxpayer, citizen in United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), or the reservist plaintiffs in Schlesinger v. Reservists Committee, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), who sought unsuccessfully to challenge CIA action and Vietnam War conduct. Those cases found no generalized standing to object to the government actions opposed by the plaintiffs. The D.C. Circuit analyzed Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (a case mentioned by the majority for consideration of standing on remand), as not suggesting that an "assumed unavailability of other plaintiffs is any more relevant to the intent of Congress" in granting or withholding citizen standing to challenge a government agency action. Cheney, 883 F.2d at 1052, quoting Clarke, 479 U.S. at 399, 107 S.Ct. at 757, ("[T]he essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law'.").
 
 
 97
 The Cheney court also considered the Office of Federal Procurement Policy Act Amendments of 1979 (OFPPAA):
 
 
 98
 Since the legislative history of the OFPPAA endorses the Executive branch policy of reliance on the private sector and the Circular finds authority in the OFPPAA, it is difficult to conclude anything but that the interests of federal employees are inconsistent with the purposes of OFPPAA. As previously discussed, appellants' real interest in this case is the protection of the federal jobs of its members, not efficiency in governmental operations.... But again in the assertion of that interest of efficiency, they have no greater claim to standing than any taxpayers.... Their real interest of job protection flies in the face of a policy that federal departments and agencies, through OMB Circular A-76, should rely on the private sector. Thus appellants' interests are inconsistent with the purposes of the OFPPAA and not within the zone of interest of that Act. Cf. Clarke, 479 U.S. at 399, 107 S.Ct. at 757.
 
 
 99
 Cheney, 883 F.2d at 1049-50. It also considered the National Defense Authorization Act of 1987 and had this to say, concluding plaintiffs had no standing on that basis:
 
 
 100
 From our review of the legislative history, the phrase "realistic and fair" was added to the Authorization Act to protect the private government contractor in the contracting out process against undue built-in "bias" favoring in-house performance of services. In fact, the phrase was added at the behest of government contractors in protest against the ten percent conversion differential.
 
 
 101
 ....
 
 
 102
 The interests of the in-house federal employees are therefore "antithetical" to the interests of the private contractors because "federal employees present an 'either-or' situation in relation to private" contractors. American Federation of Government Employees, Local 1668 v. Dunn, 561 F.2d 1310, 1313 (9th Cir.1977) (federal employees lack standing to contest a contracting out of an Air Force food service facility). Thus appellants' interest is inconsistent with the purpose of the [sic] section 1223(b) which provides for contracting out where that is the most cost-efficient alternative. It follows that appellants' interests are not within the zone of interests of the Authorization Act of 1987.
 
 
 103
 Cheney, 883 F.2d at 1050, 1051.
 
 
 104
 I share the concern expressed by another court about costly delays and discouragement of bidders if federal employees might be allowed to come in after the administrative "contracting out" process resulting in a successful bid to attempt to set the entire process aside through grievance procedures or otherwise. See Department of Health & Human Services v. FLRA, 844 F.2d 1087 (4th Cir.1988) (en banc).
 
 
 105
 Another case similar to the one at issue, American Fed'n of Gov't Emp. v. Stetson, 640 F.2d 642 (5th Cir.1981), involved custodial workers at Randolph Air Force Base, Texas, and the contracting out of custodial services. Stetson held that the displaced employees and their union had no standing to contest the contract owned by the government agency:
 
 
 106
 Not only are the rights of the federal employees outside "the zone of interest," the interests of the federal employees are antithetical to those of the private employees. It was on behalf of the latter that the Service Contract Act was passed. We are in full accord with the conclusions of our colleagues of the Ninth Circuit in a case which is factually and legally identical to that before us. Am. Fed. of Government Emp., Local 1668 v. Dunn, 561 F.2d 1310 (9th Cir.1977).
 
 
 107
 Stetson, 640 F.2d at 646. The Dunn decision, approved by Stetson, involved mess attendants at an Alaska Air Force Base displaced by a similar contracting out of mess hall services to a private contractor. Dunn held that the mess hall attendants had no standing to contest the contracting out award.
 
 
 108
 Still another case found, in an action brought by the same union involved in Stetson and Dunn, that plaintiff Army civil service employees at the Huntsville, Alabama Missile Command had no standing to challenge agency action in cutting back employment as the consequence of an award to private contractors. See American Fed'n of Gov't Emp. v. Hoffmann, 427 F.Supp. 1048 (N.D.Ala.1976). The challenge in Hoffmann was based upon OMB Circular A-76, DOD 4100.33 and 4100.15 contentions, the basis of the majority's discussion concerning agency discretion in the instant case.
 
 Hoffmann concluded:
 
 109
 Defendants contend that plaintiffs have not demonstrated the requisite standing to maintain this action. To show standing plaintiffs must first allege and be able to prove that the challenged action has caused them injury in fact, economic or otherwise. Secondly, they must be able to show that the interest they seek to protect is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Barlow v. Collins, 97 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The court must conclude that they have satisfied neither of these tests.
 
 
 110
 Hoffmann, 427 F.Supp. at 1082. The district court in Hoffmann discussed fully its conclusion that plaintiffs lacked standing under the Administrative Procedure Act (APA), the basis for the majority analysis in this case involving Fort Knox:
 
 
 111
 As to the zone of interests element of the current standing test, plaintiffs have asserted that their interests are protected by the provisions of OMB Circular A-76, DOD Directives 4100.33 and 4100.15, AR 235-5 and the ASPR. These regulations and directives constitute managerial and policy tools to aid in the procurement of supplies and services for the Federal Government and military services. They are not intended to provide benefits to plaintiffs. See Kuhl v. Hampton, [451 F.2d 340 (8th Cir.1971) ]. Rather they have been promulgated to promote the efficient functioning of the military establishment and the economy of the service. See Independent Meat Packers v. Butz, [526 F.2d 228 (8th Cir.1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976) ]; Allgood v. Kenan, [470 F.2d 1071 (9th Cir.1972) ]; Silverthorne v. Laird, [460 F.2d 1175 (5th Cir.1972) ]; Cortright v. Resor, 447 F.2d 245, 251 (2d Cir.1971), certiorari denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972).
 
 
 112
 Such regulations do not constitute a relevant statute for plaintiffs, within the meaning of the APA. See Pullman Incorporated v. Volpe, 337 F.Supp. 432, 440 (E.D.Pa.1971). Further, these regulations and directives provide no implied private right of action to the plaintiffs to enforce their provisions. See Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); Acevedo v. Nassau County, 500 F.2d 1078, 1082-84 (2d Cir.1974); Farkas v. Texas Instrument Corporation, 375 F.2d 629, 633 (5th Cir.1967), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967).
 
 
 113
 Hoffmann, 427 F.Supp. at 1083. See also Local 2855, AFG v. United States, 602 F.2d 574 (3d Cir.1979); Nat'l Maritime Union v. Commander, Military Sealift Command, 632 F.Supp. 409 (D.D.C.1986), aff'd, 824 F.2d 1228 (1987). The Comptroller General has reached the same conclusion as the courts above that under OMB Circular A-76 there is no private right of action, no standing, for federal employees to contest a decision to contract out work on services. See In the Matter of U.S.D.C. for Dist. of Col., 58 Comp.Gen. 452 (1979); Comptroller Gen.Resp. B-223558 (Sept. 2, 1986) (unpublished) ("unions and employees do not fall under the statutory definition of 'interested parties' "). The only benefit plaintiffs can claim as taxpayers, rather than as employees seeking to protect their jobs, is the benefit unsuccessfully sought by plaintiffs in Schlesinger v. Reservists, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), and this was foreclosed by the Supreme Court.
 
 
 114
 I would conclude that plaintiffs have no standing to disrupt and interfere with the congressionally intended equitable and expeditious process of private contract bidding and the exercise of agency discretion on the most efficient and economic manner of operating mess halls at Fort Knox. Under the Administrative Procedure Act, 5 U.S.C. § 702, I would hold that plaintiffs have suffered no "legal wrong," no "injury in fact" as a consequence of the agency action. Warth v. Seldin, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). Neither have they been adversely affected by the agency action within the meaning of a relevant statute. See Cheney, 883 F.2d at 1043. I would further find that plaintiffs do not come within the "zone of interests" as set out in Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). See also Block v. Community Nutrition Inst., 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); Valley Forge Christian College v. Americans United, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).
 
 
 115
 In the record, an uncontested affidavit by the successful private bidder, Colbar, Inc., states that it "anticipates the hiring of all of the approximately 280 food service employees that are presently employed," and that, specifically it would offer "employment to the two named plaintiffs in this suit." (Emphasis added). To the extent that plaintiffs claim standing as mess hall workers (and seek to represent a class of all such employees), the uncontested facts would seem to indicate little or no adverse economic effect because no loss of plaintiffs' employment is threatened by converting the mess hall operation to a private contractor.
 
 
 116
 In the face of the substantial authority cited, plaintiffs have cited no authority purporting to give them standing in this type of situation. The majority decision suggests no authority that specifically sets out that plaintiffs in the position of Diebold and Plumblee have standing to pursue this challenge to the agency action taken. I would affirm the district court's result based on lack of standing.
 
 II. AGENCY DISCRETION
 
 117
 The majority's decision that the decision in controversy was not "committed to agency discretion by law" is first based upon its assumption, which I believe to be unsupported, that "[t]he law to apply in the disappointed bidder cases is precisely the same set of laws and regulations as in disappointed in-house employee cases like this one." The majority in this respect simply ignores the Cheney holding to the contrary (a case "on all fours").
 
 
 118
 Neither appellants nor their members bid on a contract and, thus, have never placed themselves in the special relationship by which the government can bind them to the bid. Moreover, with no bid on a solicitation, it is impossible for them to be within the zone of active consideration. Thus, we hold that appellants do not have disappointed bidder standing to contest the contracting out decision made by Fort Sill. As we stated in National Maritime [Union v. Commander, Military Sealift Command ], regarding an assertion of disappointed bidder standing by a union representing employees of an unsuccessful bidder, "the right is [the contractor's], not [the union's]." 824 F.2d [1228,] 1238 [ (D.C.Cir.1987) ].
 
 
 119
 Cheney, 883 F.2d at 1053-54. See also Control Data Corp. v. Baldridge, 655 F.2d 283, 293 (D.C.1981) (disappointed bidder status unavailable to persons who "cannot claim the special relationship found ... to exist between a bidder and the government"); National Maritime Union, 824 F.2d 1228, 1237-38 (D.C.Cir.1987).
 
 
 120
 Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), cited by the majority for the proposition that unreviewability of actions "committed to agency discretion" is a narrow exception under APA, also states that when "Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830, 105 S.Ct. at 1655. Heckler held that "individual decisions of the Food and Drug Administration not to take enforcement action ... are presumptively not reviewable under the Administrative Procedure Act." Id. at 838, 105 S.Ct. at 1659. (Brennan, J., concurring.) Heckler simply constitutes one example of agency discretion not subject to judicial review, and the majority later concedes it is not "on point."
 
 
 121
 Since I conclude, together with the case authority cited, that plaintiffs are not in the same posture as disappointed bidders, the whole postulate of the majority must fail. Disappointed bidder cases are simply not applicable to this situation.[2] Even if the disappointed bidder status were a proper analogy, our circuit has indicated doubt about the rights of unsuccessful bidders under an agency procurement action to obtain injunctive relief such as that sought by plaintiffs here. See Cincinnati Electronics v. Kleppe, 509 F.2d 1080 (6th Cir.1975).
 
 
 122
 At oral argument in this case, moreover, plaintiffs' counsel conceded that cost calculations made by the agency are not reviewable, and that methods of calculation chosen by the agency are within the agency's discretion. The majority cites no case law authority in support of its position that this review of agency action involves a dispute that requires an accounting and that "[c]ourts have long dealt with [such] disputes." The majority adds that "there is no Supreme Court case on point to guide our decision." Administratively, plaintiffs' appeal of the award decision was denied on the basis "that the costs at issue were not within the scope of the commercial activity comparison." The Army in this case, after a GAO study, reaffirmed its position on the costs question.
 
 
 123
 The existence of broad discretionary power in an agency often suggests that the challenged decision is the product of political, military, economic, or managerial choices that are not really susceptible to judicial review. Indeed, given the separation of powers between the judiciary and the other branches of government, it would appear unseemly in such circumstances for a court to substitute its judgment for that of an executive or agency official.
 
 
 124
 ....
 
 
 125
 In addition, we note that courts have been especially inclined to regard as unreviewable those aspects of agency decisions that involve a considerable degree of expertise or experience, or that are based upon economic projections and cost analyses, at least when the agency has broad leeway to devise the formula to be applied in any particular situation and when there are no discernible guidelines against which the agency decision may be measured.
 
 
 126
 Local 2855, AFGE v. United States, 602 F.2d 574, 579 (3d Cir.1979). Furthermore, the majority dismisses even more explicit language in Local 2855:
 
 
 127
 Congress never intended that the plaintiffs be afforded a judicial forum to contest the studies and evaluations that formed the basis for the Army's decision, inasmuch as that managerial decision and the studies and evaluations upon which it rested involved "questions of judgment requiring close analysis and nice choices."
 
 
 128
 This conclusion is confirmed by an examination of the statutory scheme.
 
 
 129
 602 F.2d at 580-81 (footnote omitted).
 
 
 130
 The last case (before Cheney ) to consider this issue of agency discretion in the military procurement or contracting out context suggests clearly why neither plaintiffs, nor the majority, have been able to cite a case supporting the majority rationale:
 
 
 131
 All of the courts which have considered the issue have held that conversion decisions made by the Department of Defense officials under Circular A-76 are committed to agency discretion and are not subject to judicial review. Local 2855, AFGE v. United States, 602 F.2d 574 (3d Cir.1979); American Federation of Government Employees v. Stetson, C.A. No. 77-2146 (D.D.C. July 2 1979); American Federation of Government Employees v. Hoffmann, 427 F.Supp. 1048, 1082-84 (N.D.Ala.1976); and AFGE, Local 1688 v. Dunn, No. A-75-156 (D.Alaska Sept. 30, 1975), aff'd on other grounds, 561 F.2d 1310 (9th Cir.1977).
 
 
 132
 American Fed'n of Gov't Emp. v. Brown, 680 F.2d 722, 726 (11th Cir.1982), cert. denied, 459 U.S. 1104, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983) (emphasis added).
 
 
 133
 For the reasons heretofore indicated, I do not consider the disappointed bidder cases relevant or material. Plaintiffs are simply not disappointed bidders and do not occupy a comparable status. No case cited by the majority indicates that disappointed federal civilian employees seeking to challenge a contract award occupy the same position as disappointed bidders. BK Instrument, Inc. v. United States, 715 F.2d 713 (2d Cir.1983), which is of particular interest to the majority, is a Small Business Act disappointed bidder case. Compare Cincinnati Electronics, 509 F.2d 1080, noted as adhering generally to Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940).[3] At most BK Instrument holds that in the Second Circuit a frustrated SBA plaintiff, who is unsuccessful in an Army procurement, may be able to attain some measure of relief. This holding under APA has no bearing on our case, in my view, for the reasons stated. BK Instrument cites none of the federal employee cases mentioned holding that plaintiffs in such situations have no standing to seek judicial review of agency discretionary decisions.
 
 
 134
 Based on the authority cited, and on my conclusion that plaintiffs cannot claim the status of a disappointed bidder nor that of a statutory interested party in contracting out procedures, I would affirm the district court's opinion that the decision in question was unreviewable by this court because it was "committed to agency discretion." Because plaintiffs also have no standing, I would affirm dismissal of their complaint.
 
 
 
 *
 The Honorable Harry W. Wellford assumed senior status on January 21, 1991
 
 
 [1]
 § 701. Application; definitions
 (a) This chapter applies, according to the provisions thereof, except to the extent that--
 (1) statutes preclude judicial review; or
 (2) agency action is committed to agency discretion by law.
 
 
 [2]
 The GAO Study, part of the Joint Appendix, provided much of the information available to this Court concerning alleged flaws in the Army's cost comparison
 
 
 [3]
 The legislation setting up the Office of Federal Procurement Policy originally was enacted in 1974 as Office of Federal Procurement Policy Act, Pub.L. No. 93-400, 88 Stat. 796. The current Circular A-76 cites later versions of the legislation, Office of Federal Procurement Policy Act Amendments of 1979, as amended, 41 U.S.C. § 401 et seq., as authority for its promulgation
 
 
 [4]
 The original Bureau of Budget Circular A-76, later renamed OMB Circular A-76, cited no statutory authority for its promulgation. The same is true of the 1967 and 1979 revisions of the Circular
 
 
 [5]
 § 2462 Contracting for certain supplies and services required when cost is lower--
 (a) In general--Except as otherwise provided by law, the Secretary of Defense shall procure each supply or service necessary for or beneficial to the accomplishment of the authorized functions of the Department of Defense (other than functions which the Secretary of Defense determines must be performed by military or Government personnel) from a source in the private sector if such a source can provide such supply or service to the Department at a cost that is lower (after including any cost differential required by law, Executive order, or regulation) than the cost at which the Department can provide the same supply or service.
 (b) Realistic and fair cost comparisons--For the purpose of determining whether to contract with a source in the private sector for the performance of a Department of Defense function on the basis of a comparison of the costs of procuring supplies or services from such a source with the costs of providing the same supplies or services by the Department of Defense, the Secretary of Defense shall ensure that all costs considered (including the costs of quality assurance, technical monitoring of the performance of such function, liability insurance, employee retirement and disability benefits, and all other overhead costs) are realistic and fair.
 10 U.S.C. § 2462 (formerly 10 U.S.C. § 2304 Note).
 
 
 [6]
 Agency procurement decisions often involve questions of the quality of performance by different bidders as well as by the in-house staff. The procurement statutes and regulations have among their goals that agencies are to consider quality and effectiveness of performance in making procurement decisions. This case involves no such questions, however. This case involves only the question whether the Army will save the ten percent required to justify contracting-out. Thus, we focus only on the directives involving economy and efficiency
 
 
 [7]
 The Supreme Court declined to rule on the issue whether Circular A-76 was an "applicable law" within the context of Title VII of the Civil Service Reform Act of 1978, saying that the IRS argument that the Circular could not be construed as an "applicable law" "calls for a very difficult abstract conclusion," one which the parties had not briefed and which the Court of Appeals had not considered. Department of the Treasury, I.R.S. v. Fed. Labor Relations Auth., 494 U.S. 922, 110 S.Ct. 1623, 1630, 108 L.Ed.2d 914 (1990). The Supreme Court reversed the judgment of Department of the Treasury, I.R.S. v. Fed. Labor Relations Auth., 862 F.2d 880 (D.C.Cir.1989), and held that the IRS was not required to bargain over a proposal from the National Treasury Employees Union that the grievance and arbitration provisions of the master labor agreement become the internal administrative appeals procedure mandated by Circular A-76. The Court relied for its decision on the plain meaning of the Management Rights clause, 5 U.S.C. § 7106(a), which declares that "nothing in this chapter shall affect the authority of any management official of any agency ... in accordance with applicable laws ... to make ... contracting out [decisions]."
 
 
 [8]
 These Bulletins made clear that private enterprise was generally to be the source of commercial goods and services except in rare circumstances, and the burden rested with the agencies to demonstrate clearly any choice to produce rather than procure from private enterprise. The Bureau of Budget issued three bulletins in the 1950s articulating the policy of the federal government in procuring goods and services: Bureau of Budget Bulletins No. 55-4 (Jan. 1955), No. 57-7 (Feb. 1957), and No. 60-2 (Sept. 1959)
 Cost was not a deciding factor in the early contracting-out decision; the agencies were to contract-out if commercial goods and services were available "through ordinary business channels," unless contracting-out was not "in the public interest." B.O.B. Bulletin No. 55-4, p 2. If cost was to be a factor, costs were to be analyzed on a "comparable basis" and a difference in cost could justify production in-house if the "differences [were] found to be substantial and disproportionately large." B.O.B. Bulletin No. 60-2, p 3B. The Bulletins gave little direction on comparing costs, and agencies had great discretion both in the decision of what was in the public interest and in comparing costs. The Bulletins made clear that government procurement policy favored free enterprise as a goal in itself but left the contracting-out process largely to agency discretion.
 Bureau of Budget Circular A-76, published in 1966, replaced B.O.B. Bulletin No. 60-2. The Circular restated the general policy to rely on private enterprise but acknowledged that "the national interest" might require Government production. p 2. The Circular defined what constituted "national interest" justification: procurement from commercial source would cause disruption or delay; government performance was necessary for combat support; a satisfactory commercial source was not available; the product or service was available from another agency; procurement from commercial source would mean higher cost to the government. p 5. Continuation of in-house production justified on the basis of cost required savings "at least sufficient to outweigh the disadvantages of Government commercial and industrial activities." p 7c(3). Nevertheless the Circular stated explicitly that "[n]o specific standard or guideline is prescribed for deciding whether savings are sufficient to justify continuation of an existing Government commercial activity and each activity should be evaluated on the basis of applicable circumstances." Id. The Circular did suggest a guideline of 10% for savings appropriate to justify a "new start" but stated that the amount of savings considered sufficient would vary with individual circumstances, particularly with the degree of capital investment required. p 7b(3). The Circular reiterated that "no precise standard is prescribed." Id.
 Although the Circular focused more clearly on cost comparison than had the B.O.B. Bulletins, it made clear that the agency retained discretion in the procurement decision despite cost comparisons. The 1967 revision of the Circular reiterated that it provided no specific standard or guideline by which to evaluate whatever savings were sufficient to continue an in-house commercial activity, p 7c(3), and that the 10% figure suggested as sufficient savings to justify an in-house "new start" was "not intended to be a fixed figure." p 7b(3). Both Circulars provided more instructions for comparing costs than the Bureau of Budget Bulletins had provided. Nevertheless, agencies had much discretion to contract-out without a cost analysis. Thus these Circulars arguably still qualified as a "loose managerial tool."
 
 
 [9]
 CC Distributors relied on a section of the National Defense Authorization Act for Fiscal Year 1987, an earlier version of the same statute at issue in our case, 10 U.S.C. § 2462. See text at note 5. CC Distributors also relied on the Part 169 regulations and Circular A-76
 
 
 [10]
 Judge Friendly recognized the problems of delay which could accompany judicial review in the procurement context but held that to be a policy problem for Congress. The Sixth Circuit recognized a more restricted standing for disappointed bidders in Cincinnati Electronics Corp. v. Kleppe, 509 F.2d 1080 (6th Cir.1975), which recognized Lukens Steel as stating the general rule as to standing. See also Hoke Co., Inc. v. T.V.A., 854 F.2d 820 (6th Cir.1988). Because we do not reach the question of standing, we are concerned with Lukens Steel only as it suggests a general reluctance for courts to be involved in reviewing procurement matters. It is this policy leaving procurement matters to the Executive branch which has been modified. Procurement matters are quite simply no longer entirely a matter of Executive discretion. The case before us requires no ruling on any standing issue at this time, for disappointed bidders or other possible plaintiffs
 
 
 [11]
 The Comptroller General does not hear protests from displaced employees. In a letter responding to a Senatorial inquiry as to whether displaced employees could take an appeal to the GAO, the Comptroller General said that because "unions and employees do not fall under the statutory definition of 'interested parties,' they are not eligible to file protests with our Office." Comptroller General Response, B-223558 (Sept. 2, 1986) (unpublished). The statute defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551. Interpretation of the statutory term "interested party" goes to the issue of standing, of course, not to the issue whether there are standards by which to judge agency action. In addition, the GAO will not review an agency decision to perform services in-house without an A-76 cost comparison process because such a case is outside its bid protest jurisdiction, there having been no solicitation of bids. See Matter of: Services Alliance Systems, Inc., B-243306 (Mar. 18, 1991) (unpublished)
 
 
 [12]
 The defendants have argued that two sentences of the administrative review provision preclude judicial review under the APA:
 a. The procedure does not authorize an appeal outside the agency or a judicial review.
 b. The original appeal decision shall be final unless the agency procedures provide for further discretionary review within the agency.
 See Circular Supplement, Part I, Chapter 2, p I; see also 32 C.F.R. § 169a.18.
 The most plausible reading of the first sentence is that the agency itself is not trying to create judicial review. The language should not be read as an attempt to interpret applicability of the APA to claims brought in relation to contracting-out. The second sentence creates final agency action, certainly not inconsistent with APA requirements. Because we do not read the review provision as seeking to prohibit judicial review, we do not reach the fundamental separation of powers problem that would be implicit in an effort by the Executive branch to regulate or to prohibit judicial review by an Article III court.
 
 
 [13]
 For example, in Local 2855 the Court quoted Justice Jackson in Orloff v. Willoughby, 345 U.S. 83, 93-94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953), as saying, " '[J]udges are not given the task of running the Army.... The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.' " 602 F.2d at 579 n. 11. The AFGE, Local 2017 v. Brown Court justified its decision on the basis of this statement as well. It is not altogether clear what the rule in Orloff has to do with an Army contracting-out decision: in Orloff the Court had before it a habeas petition from a doctor obliged to serve a stint in the military because the Army had paid for his education. He did not get assigned as an officer because he would not answer whether he had ever been a member of the Communist Party. The case has no connection to APA review and clearly involves "Army matters," basic military decisions such as induction, commission, and assignment rather than a directive to choose the most economical way to procure commercial supplies and services such as food service and maintenance and housing
 
 
 [14]
 Other courts declining to hear contracting-out complaints are similarly inapplicable. See American Fed'n Gov't Employees, Local 1668 v. Dunn, No. A75-156, 1975 WL 1172 (D.Alaska Sept. 30, 1975) (WESTLAW, Allfeds library, Dist. file) (District Court, asserting without discussion a finding that methods for cost comparison dealing with early version of Circular A-76 are committed to agency discretion by law); Ninth Circuit, in affirming judgment of the case, did not reach question of jurisdiction under the APA, but decided case on standing grounds, see American Fed'n Gov't Employees, Local 1668 v. Dunn, 561 F.2d 1310 (9th Cir.1977); American Fed'n Gov't Employees v. Hoffmann, 427 F.Supp. 1048 (N.D.Ala.1976) (considering Army decision to contract-out systems engineering and technical assistance functions for the Ballistic Missile Defense Systems Command in a contracting-out decision implicating national defense and strategic arms limitations talks and ruling, under an early version of Circular A-76, that Army's decision was not subject to review); American Fed'n Gov't Employees, Local 1872 v. Stetson, No. 77-2146, 1979 WL 1919 (D.D.C. July 24, 1979) (WESTLAW, Allfeds library, Dist file) (reviewing an Air Force decision to contract out garbage collection, a decision made under the 1966 version of Circular A-76, and dispensing with the issue of jurisdiction in only two paragraphs; citing the Third Circuit's reliance on "the broad discretionary power in an agency" and without examining particular statutory and regulatory language, Court concluded that "there is no law to apply," id. at 5). See also American Fed'n Govn't Employees, Local 1841 v. United States Department of Defense, 682 F.Supp. 479 (D.Nev.1988) (relying on American Fed'n Govn't Employees v. Brown and Local 2855, American Fed'n Govn't Employees v. United States for holding that contracting-out decision is committed to agency discretion by law without noting that both courts described earlier version of Circular A-76, before promulgation under 41 U.S.C. § 401 et seq.). Other cases have considered contracting-out disputes but provide no guidance because they did not reach the question of "law to apply" and jurisdiction. See National Fed'n Fed. Employees v. Cheney, 883 F.2d 1038 (D.C.Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990) (dismissing on basis of standing a contracting-out case brought by displaced employees); IAMAW, Naval Air Lodge 1630 v. Secretary of the Navy, 915 F.2d 727 (D.C.Cir.1990) (considering merits of case, despite fact that plaintiffs probably had no standing under the D.C. Circuit's prior decision, National Fed'n Fed. Employees v. Cheney; not reaching issue of "law to apply" and jurisdiction); National Maritime Union of America v. Commander, MSC, 824 F.2d 1228 (D.C.Cir.1987) (reaching merits of case complaining of violations of Circular A-76 without deciding whether plaintiffs had standing under Circular A-76 or whether court had jurisdiction to hear under APA)
 
 
 [15]
 Earlier cases denying review have suggested review is not available when statutes are written in permissive language or when statutes state that the decision of the Executive branch is final. See Schilling v. Rogers, 363 U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960) (finding that review of administrative action denying claim for return of property under the Trading with the Enemy Act was not reviewable because review was precluded and the matter was committed to agency discretion under statute written in very "permissive" language, id. at 674, 80 S.Ct. at 1294, which provided that officials " 'may return any property or interest vested in or transferred to the Alien Property Custodian ... or the net proceeds thereof, whenever the President or such officer or agency shall determine....,' " id. at 667, 80 S.Ct. at 1290); Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 313, 78 S.Ct. 752, 754, 2 L.Ed.2d 788 (1958) (holding that readjustment of tolls for Panama Canal under statute which explicitly provided that "changes in rates of tolls shall be subject to ... the approval of the President ... whose action in such matter shall be final and conclusive" was left to discretion of agency and result was not reviewable under APA); Southern Ry. Co. v. Seaboard Allied Milling Corp., 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979) (holding that agency decision not to investigate proposed rate schedule was not reviewable, given enforcement channels still available and permissive language of provision at issue ("Commission may ... order a hearing," id. at n. 1), and relying on Overton Park for "no law to apply" as rule distinguishing cases in which review is unavailable, id. 442 U.S. at 455, 99 S.Ct. at 2395)
 
 
 [16]
 We make no judgment on other issues still to be resolved before these plaintiffs have established a right to bring their complaint in federal district court. The District Court may well need to consider a number of factors, among them the following:
 (1) Have these plaintiffs, as temporary employees, established "injury in fact, economic or otherwise," Association of Data Processing Service Org. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), to sustain Article III standing? Does the plaintiffs' status as temporary federal employees affect the degree of protection afforded them by the statutes under which they claim? See National Maritime Union of Am. v. Commander, MSC, 824 F.2d 1228 (D.C.Cir.1987) (suggesting possible distinction between permanent and temporary employees in protection afforded displaced employees).
 (2) Do the plaintiffs meet the prudential standing requirements, that is, are they "arguably within the zone of interests to be protected or regulated by the statute[s] ... in question," Data Processing v. Camp, 397 U.S. at 153, 90 S.Ct. at 830; see also Clarke v. Sec. Indus. Ass'n., 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); and National Fed'n Fed. Employees v. Cheney, 883 F.2d 1038 (D.C.Cir.1989)? Are there possible parallels between displaced employees and disappointed bidders? See International Ass'n of Firefighters, Local F-100 v. United States Dep't of the Navy, 536 F.Supp. 1254 (D.R.I.1982).
 (3) Does the Circular A-76 appeal procedure's stated purpose, "to protect the rights of all directly affected parties--Federal employees and their representative organizations, and bidders or offerors on the instant solicitation," Circular Supplement, Part I, Chapter 2, p I; 32 C.F.R. § 169a.18, affect the issue of standing for these plaintiffs?
 (4) Did these plaintiffs exhaust the available administrative remedies, that is, did they file a protest under the Circular A-76 procedure? Does the Union's filing the protest affect the plaintiffs' need to file their similar protest? Is exhaustion of the remedy available under Circular A-76 required in cases bringing a complaint in federal district court under procurement statutes and regulations?
 
 
 [1]
 Strangely, in remanding for standing consideration, the majority makes no mention of Cheney, except a brief footnote reference, which is directly on point. Instead, the majority refers to several other cases dealing with temporary status employees. Plaintiffs' brief concedes a stipulation that "the facts of this case were four square with the Cheney decision." If plaintiffs are merely temporary employees, they have less claim to standing than did the employees in Cheney
 
 
 [2]
 This court in Cincinnati Electronics Corp. v. Kleppe, 509 F.2d 1080 (6th Cir.1975), noted in an unsuccessful bidder case, relying on APA for review, that absent a "congressionally created exception, the general rule of Perkins v. Lukens Steel [, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) ] [is] that a disappointed bidder has no legally enforceable right against the government's award of a procurement contract...." Id. at 1086
 
 
 [3]
 The majority concedes that Lukens Steel "continues to provide valuable guidance concerning the primary purpose of the procurement laws." At footnote 9, it concedes that "it suggests a general reluctance for courts to be involved in reviewing procurement matters."