**NATIONAL AIR TRAFFIC CONTROL-LERS ASSOCIATION, MEBA, AFL–CIO, et al., Plaintiffs,**

**v.**

**SECRETARY OF THE DEPARTMENT OF TRANSPORTATION, et al., Defendants.**

No. 1:94CV0574.

United States District Court,
N.D. Ohio,
Eastern Division.

March 2, 1998.

Eben O. McNair, Schwarzwal & Rock, Cleveland, OH, James E. Grooms, Elizabeth J. Head, Beins, Axelrod, Osborne, Mooney & Green, Washington, DC, William W. Osborne, Jr., Law Offices of William W. Osborne, Jr., Washington, DC, for Plaintiffs.

Kent W. Penhallurick, Office of U.S. Atty., Cleveland, OH, Sandra M. Schraibman, Dept. of Justice, Civil Div., Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The National Air Traffic Controllers Association, MEBA, AFL—CIO ("NACTA") and two individual air traffic controllers, David Clinksdale and Margaret Graham, filed this suit against the Secretary of the Department of Transportation ("DOT"), and the Administrator of the Federal Aviation Administration ("FAA"), challenging the FAA's decision to privatize FAA-operated Level 1 air traffic control towers. Both parties have filed motions for summary judgment. For the following reasons, this Court grants the plaintiffs' motion in part and denies it in part (doc. # 56, 59), denies the defendants' motion (doc. # 57), vacates the FAA's privatization program of FAA-operated Level 1 towers, and remands this case to the FAA for further proceedings consistent with this order.

### I. Procedural History

The FAA determined that it would privatize operations at 129 Level 1[1] air traffic control towers (FAA-operated towers) from 1994 through 1998[2], approximately 25 per

---

**1.** The FAA has five classifications of air traffic control towers, classified according to the level of complexity and the volume of the air traffic they handle. Level 1 towers have an hourly traffic density factor of less than 35 operations, are generally located in the outskirts of urban areas or in rural areas, and service light aircraft. Level 5 towers, on the other hand, include those at Kennedy and O'Hare airports.

Air traffic controllers "separate" air traffic using either electronic instruments, an "instrumental flight rules" ("IFR") flight, or primarily by sight, a "visual flight rules" ("VFR") flight. The parties dispute the extent to which Level 1 controllers perform IFR functions. Plaintiffs allege

that air traffic control at Level 1 towers is an "inherently governmental function" because Level I air traffic controllers perform IFR functions. Defendants allege that the Level I controllers perform only VFR functions, and thus are not inherently governmental.

**2.** At the time the complaint was filed, the plaintiffs alleged that the FAA had slated 115 towers for privatization. Defendants claim that changing traffic volumes has resulted in the FAA downgrading certain towers, increasing the total number of Level 1 towers for privatization to 129. (Def.Mot.S.J. at 5 (doc. # 57)). The exact date on which the FAA made its decision to privatize these towers is disputed by the parties.

year. (AR 942–43) (Def.Mot.S.J. at 5 (doc. # 57)). The plaintiffs allege that this privatization decision will force 1,500 air traffic controllers employed by the FAA to either (1) relocate to another FAA facility to remain employed by the FAA as air traffic control specialists; or (2) retire or resign from federal service, in which case they may seek employment with the contractor that takes over their tower.

As of May 6, 1997, the FAA had privatized 85 towers. (Def.Mot.S.J. at 4 (doc. # 57)). Defendants allege that of the 609 employees affected by the privatization, 596 have received promotions through reassignment, and 86% received their first choice assignment upon relocation. (*Id.* at 9).

Federal policy, as it relates to the FAA and DOT, is governed by the Office of Federal Procurement Policy Act ("OFPPA"), 41 U.S.C. § 401 *et seq.*, and the Budget and Accounting Act of 1921 ("Act of 1921"), 31 U.S.C. § 101 *et seq.* Pursuant to these statutes, the Office of Management and Budget ("OMB") promulgated OMB Circular A–76 ("Circular"), which governs agency decisions on whether functions should be performed in-house by federal employees or under contract with commercial sources. The Circular sets out an elaborate, mandatory scheme of procedures which agencies must follow before privatizing such functions. *See Diebold v. United States,* 947 F.2d 787, 789 (6th Cir.1991), *reh'g denied,* 961 F.2d 97 (6th Cir. 1992).

Specifically, the Circular first requires an agency to evaluate its functions to determine whether they are inherently governmental or commercial. Circular at ¶ 5. Inherently governmental functions must be performed in-house by government employees. *Id.* at ¶ 5(b). If, however, a function is not inherently governmental, then the Department of Defense establishes criteria to determine if the function should be performed in-house for national defense readiness purposes. *Id.* at ¶ 8(b); Supp. at I–6. If not, then the agency must determine if satisfactory commercial sources are available to perform the

function. *Id.* at ¶ 8; Supp. at I–6. If such sources are available, then the agency must complete a cost comparison study to determine if the activity can be performed more economically by the private sector. Supp. at I–6. If the agency determines that satisfactory commercial sources are available, and that the government has no reasonable expectation of winning the price competition, then the assistant secretary of the agency may waive the study. *Id.* at I–11. If the activity can be performed more economically by the private sector, then the agency must privatize the activity. Circular at ¶ 5(c). The agency, however, need not comply with the Circular and its Supplement "when contrary to law, Executive Orders, or any treaty or international agreement." *Id.* at ¶ 7(c)(1).

In 1994, the plaintiffs, NACTA, a labor organization comprised of approximately 12,-000 air traffic control specialists, and Clinksdale and Graham, FAA employees at the Burke Lakefront Airport in Cleveland, Ohio, filed suit challenging the decision to privatize FAA-operated Level 1 air traffic control towers [3]. Plaintiffs allege that this privatization violates the statutory scheme established by the Act of 1921, the OFPPA, and the Circular and its Supplement because (1) the FAA is unlawfully contracting out an inherently governmental function; (2) the FAA's privatization decision impairs the national defense; (3) the FAA improperly waived the cost-comparison study; (4) the FAA did not determine whether a satisfactory commercial source for controller services existed; and (5) the FAA's decision does not meet the cost/benefit requirements of the Circular and its Supplement.

On November 28, 1994, this Court granted defendants' original motion to dismiss the suit, holding that plaintiffs failed to meet the prudential requirements for standing under the Administrative Procedure Act ("APA"). The Court of Appeals for the Sixth Circuit reversed that decision and remanded the case to this Court to complete the standing analysis. *Nat'l Air Traffic Controllers Ass'n et al. v. Pena,* 78 F.3d 585 (6th Cir.1996)

---

3. The FAA has allegedly also contracted out air traffic control towers which were closed by the air traffic controllers' strike of 1981. NACTA

does not dispute that decision, but instead only disputes the decision to contract out Level 1 towers currently operated by the FAA.

(unpublished disposition). On November 8, 1996, this Court held that the plaintiffs had standing under Article III of the Constitution and that the case is ripe for review. On December 10, 1996, the Court held that NACTA had not failed to exhaust its administrative remedies and denied the defendants' motion to dismiss the claim that the cost-comparison study was improperly waived.

On December 17, 1996, the plaintiffs filed a motion to compel discovery, arguing that the administrative record is incomplete and that the FAA acted in bad faith. On January 16, 1997, the Court granted the plaintiffs' motion in part, holding that the plaintiffs failed to show that the administrative record is incomplete, but that the plaintiffs were entitled to discovery limited to the issue of whether the FAA acted in bad faith.

On May 6, 1997, both parties filed motions for summary judgment. Plaintiffs allege that the FAA was required to comply with the Circular; that the privatization decision is unlawful because Level 1 air traffic control is an inherently governmental function; that the FAA invalidly waived the cost-comparison study; and that the defendants acted in bad faith. They seek to enjoin the FAA from privatizing FAA-operated Level 1 towers. Defendants concede that the FAA did not determine whether the operation of FAA Level 1 air traffic control towers is an inherently governmental function. They allege, however, that (1) they were not required to conduct the A–76 analysis, as Congress already mandated that the FAA contract out FAA-operated Level 1 towers; (2) even if the FAA was required to conduct the A–76 analysis, Level 1 air traffic control is not an inherently governmental function; (3) Congress, by endorsing the program, has determined that the privatization of Level 1 air traffic control towers does not impair the national defense, and that the Department of Defense approved that decision; (4) commercial sources to perform Level 1 air traffic were available; (5) the FAA could not expect to win the price competition; (6) the FAA properly waived the cost-comparison study;

and (7) the defendants did not act in bad faith. On July 24, 1997, plaintiffs filed a supplemental affidavit. On August 15, 1997, defendants filed a motion to strike that affidavit as not based on personal knowledge of the affiant.

## II. History of the Contract– Tower Program

In 1981, the nation's air traffic controllers went on strike, and the FAA closed 80 air traffic control towers (AR 740). In 1981, at the request of the OMB, the FAA initiated a study to examine "consequences for contracting out the operation of low activity VFR control towers," (AR 739). In 1982, Congress enacted § 526 of the Airport and Airway Improvement Act of 1982 ("1982 Act"), Pub.L. No. 97–248, 96 Stat. 698 (codified as amended at 49 U.S.C. § 47124 (West 1997)). (AR 682–83). Section 526 states:

In the powers granted under section 519[4] of this title, the Secretary, in entering into a contract or other agreement with any State or political subdivision thereof for the purpose of permitting such State or subdivision to operate any airport facility within such State or subdivision shall insure that such contract or agreement contain, among others, a provision relieving the United States of any and all liability for the payment of any claim or other obligation arising out of or in connection with acts or omissions of employees of such State or political subdivision in the operation of any such airport facility.

The House Conference Report states:

This section provides that in contracting out for the operation of any airport facility by any State or political subdivision thereof, the Secretary of Transportation is to assure that any contract, lease, or other agreement by which the State or political subdivision would undertake the responsibility for operating an airport facility must contain a provision holding the United States Government harmless from liability for acts or omissions of an employee or agent of the State or subdivision.... The Farmington, New Mexico, control tower is

---

4. Section 519 states that the DOT Secretary "is empowered to perform such acts ... as the Secretary considers necessary to carry out the provi-sions of, and to exercise and perform the Secretary's powers and duties, under this title."

illustrative of the application of this provision. The control tower is now staffed and operated by private air traffic controllers at approximately half the costs associated with F.A.A. personnel. On October 1, 1982, the F.A.A. plans to staff the tower with F.A.A. controllers ... This provision provides the authority for the City of Farmington to continue the operations of the control tower by private controllers and maintain overall continuity. With the use of F.A.A. funds to pay the costs associated with contracted air traffic control services, the heavy burden of financially supporting the control tower is removed from the City of Farmington.

H.R.CONF.REP. No. 97–760, at 720–21 (1982), *reprinted in* 1982 U.S.C.C.A.N. 781, 1482–83.

The FAA interpreted the 1982 Act to provide it with "contracting authority," and in 1983 it initiated a Level 1 tower pilot program for 5 tower locations to determine the feasibility of contracting out certain towers and to gather data to assist the FAA in developing a national contract tower program. (AR 717, 740). On November 18, 1983, the Senate Appropriations Committee sent the DOT Secretary a letter to expedite the program because it is "consistent with the [Reagan] Administration's goal of turning programs over to the private sector where appropriate." (*Id.* at 837).

In 1984, the FAA developed a "Level I VFR Airport Traffic Control Tower Program." (*Id.* at 735). In an outline of that program, the FAA stated that it would contract out towers which were currently closed, contract out 15 FAA-operated Level I towers, and expand the program to other Level 1 towers in the future. It also stated that it would not conduct an A–76 analysis for the currently closed towers, but would conduct an A–76 analysis for the FAA-operated towers, stating: "As part of its A–76 analysis, the FAA must compare the projected costs of a contractor operated tower to operating it as an FAA facility. Employees and managers at the affected facilities will have an opportunity to demonstrate, through the A–76 process, that the facility should be maintained as an FAA facility." (*Id.* at 750, 752, 760). In a 1986 memorandum, the FAA stated that the current program was not an A–76 effort. (*Id.* at 828). At that time, however, no FAA-operated towers were being contracted out. The FAA Administrator proposed to cancel the program in 1986 because the program was not economical; the program was put on hold while it was reviewed. (*Id.* at 717, 824).

In 1987, Congress enacted § 306 of the Airport and Airway Safety and Capacity Expansion Act of 1987 ("1987 Act"), Pub.L. 100–223, 101 Stat. 1526, (codified as amended at 49 U.S.C. § 47124 (West 1997)). Section 306 states:

The Secretary shall continue in effect the low activity (VFR) Level I air traffic control tower contract program established under section 526 of the Airport and Airway Improvement Act of 1982 with respect to existing contract towers and shall extend such program to other towers as practicable.

The House Conference Report states:

Senate provision modified to clarify that the program is to be continued at existing towers and extended to other towers as practicable.

This provision directs the Secretary to continue the contract tower program, currently administered by the FAA. Following the 1981 air traffic controller strike, the FAA closed a number of low activity control towers in order to move personnel to other more essential activities. To reinstate service at those airports, the FAA began to contract with local government jurisdictions for the operation of these low activity towers. These governments have, in turn, used their own employees or contracted with private firms for the operation of the towers.

In recent months, the Federal Aviation Administration has exhibited some reluctance to continue this program. The Conferees believe that the contract tower program has provided significant benefits in terms of aviation safety, as well as economic development for participating communities, and believe that those towers currently being operated should remain in operation. In addition, the conferees direct the Secretary to make every effort to

extend this program to those low activity air traffic control towers that remain closed, or to new towers determined by the Secretary to qualify for contract operations.

H.R.CONF.REP. No. 100–484, at 77–78 (1987), *reprinted in* U.S.C.C.A.N. 2630, 2652–53; (AR 680–81).

In 1989, the FAA issued a "Low Activity (Level 1) VFR Control Tower Plan," in which the FAA intended to expand the program, reviewing and scheduling all Level 1 VFR towers for contracting over a ten-year period on a case-by-case basis. (*Id.* at 688, 690). The plan stated that the 1987 Act "expresses support for the Contract Tower Program and directs FAA to strengthen and expand it where feasible." (*Id.* at 717). By 1992, the FAA had contracted out 27 Level 1 towers: 17 that had been temporarily closed by the 1981 strike; 9 new towers; and one FAA-operated tower, that the FAA had operated on a seasonal basis. (*Id.* at 647).

On April 23, 1992, the FAA issued a "FAA Contract Tower Benefit–Cost Analysis". The analysis stated: "The National Air Traffic Controllers Association (NACTA) union has accepted the [contract tower] program to date largely because it has not impacted FAA-operated towers. However, the transition of FAA-operated towers to contract towers may lead to opposition from the union." (*Id.* at 659).

On October 31, 1992, Congress enacted § 201(h) of the Airport and Airway Safety, Capacity, Noise Improvement, and Intermodal Transportation Act of 1992 ("1992 Act"), Pub.L. 102–581, 106 Stat. 4890, (codified as amended at 49 U.S.C. § 47124 (West 1997)) which states:

Contract Tower Program.—The Administrator may enter into a contract, on a sole source basis, with a State or political subdivision thereof to operate an airport traffic control tower classified as a level I

visual flight rules tower by the Administrator if the Administrator determines that the State or political subdivision has the capability to comply with the requirements of this subsection. Any such contract shall require that the State or political subdivision comply with all applicable safety regulations in its operation of the facility and with applicable competition requirements in the contracting of any work to be performed under the contract.

In 1993, Vice President Gore issued a "Report of the National Performance Review" ("NPR") that recommended "converting 99 Level I (low use) air control towers to contract operation and reviewing the remaining Level I towers for possible decommissioning." (AR 198–99).

In June, 1993, the FAA completed a "Level 1 Tower Staff Study", which developed a plan to contract out 99 Level 1 towers over four years beginning in 1994. (*Id.* at 176, 180–81). On October 27, 1993, Congress passed the Department of Transportation and Related Agencies Appropriations Act, 1994, Pub.L. 103–122, 107 Stat. 1203 ("1994 Act"). The 1994 Act provides funding for FAA operations and does not specifically mention the program to contract out Level 1 towers.[5] The House Committee Report to the appropriations bill of the 1994 Act, H.R. 2750, states:

*Air traffic control tower streamlining project.*—The Committee received testimony this year indicating the significant savings which could occur from a streamlining of FAA's current operation of low activity (level 1) VFR control towers. This includes the closure of towers which no longer meet the FAA's established criteria for continued operation, and placing most of the remaining level 1 towers in the contract tower program. This proposal has extremely high economic merit, paying for its up-front costs in just two or three years of operation, saving the FAA approximate-

---

5. The 1994 Act states:

For necessary expenses of the Federal Aviation Administration, not otherwise provided for, including administrative expenses for research and development, establishment of air navigation facilities and the operation (including leasing) and maintenance of aircraft, and carrying out the provisions of the Airport and Airway Development Act, as amended, or other provisions of law authorizing the obligation of funds for similar programs of airport and airway motor vehicles for replacement only, $4,580,-518,000, of which $2,294,500,000 shall be derived from the Airport and Airway Trust Fund.

ly $20,000,000 in annual operating expenses. Accordingly to the FAA, the streamlining program will have no impact on airway safety. Given the continued significant pressure on the federal budget, the FAA simply cannot continue to operate these low activity towers in the same manner it has in the past. In order to begin what is expected to be a multiyear program, the Committee has provided $7,300,-000 in this appropriation to cover first-year costs of the streamlining program. In addition, the Committee has provided $8,500,000 under "facilities and equipment" for permanent change of station moves associated with the program. This funding should be sufficient to decommission the 13 facilities currently in "temporarily closed" status and contract out approximately 25 additional facilities.

H.R.REP. No. 103–190, at 40–41 (1993); (AR 201). The Senate Report to that bill states:

The House has provided $7,300,000 to streamline the operation of level I visual flight rules control towers. Streamlining means closing some towers that no longer meet established criterias and converting other towers to operation by contractors.... For some time, the Committee has promoted the general practicality of this program but has been concerned about how FAA plans to manage the program.

S.REP. No. 103–150, at 56–57 (1993); (AR 204).

On January 12, 1994, the FAA waived the Circular's cost-comparison study. (AR 1, 959). In the waiver, the FAA stated that the program "has taken on a new urgency because its completion is now specifically identified in the National Performance Review" and that:

[t]he requirement for the Level 1 tower privatization initiative *may become law,* or at least appear in accompanying report language to the Department of Transportation Appropriation bill. Although legislation and/or the Administration's express guidance regarding this privatization initiative may take precedence over the A–76 process, it is prudent to minimize the possibility of conflicts or the need for legal

interpretations ... This waiver simplifies the situation and significantly lessens the chance that such problems will occur.

(*Id.* at 2–3) (emphasis added).

On March 21, 1994, Nicholas Stoer, the FAA Assistant Administrator for Budget and Accounting and the FAA official who waived the A–76 study, stated in a memorandum:

A–76 contains several procurement policy provisions regarding the direct contracting out or the return to in-house performance of presently contracted functions. *In either case such functions are supposed to undergo A–76 cost comparison, Consequently, even though the National Performance Review and 1994 Appropriation directed that 100 level 1 towers be contracted out, we [FAA] had to find a privatization method consistent with A–76 procurement policy.*

(*Id.* at 1, 627) (emphasis added).

On April 12, 1994, the FAA submitted its request for proposals from prospective contractors. (*Id.* at 285). The FAA proposed to contract for five year periods—one "base year", plus four one-year options to renew. (*Id.* at 272). The FAA then proceeded with its plan to contract out FAA-operated Level 1 towers and began to contract out such towers to private contractors. (*Id.* at 260–71); (Def. Reply at 10 n. 5 (doc. # 61)).

On July 5, 1994, Congress revised Title 49 of the United States Code (governing transportation), and enacted Pub.L. 103–272, 108 Stat. 1276. This Act incorporates the 1982, 1987, and 1992 Acts. Section 47124, entitled "Agreements for State and local operation of airport facilities", states:

(a) Government Relief from liability.—The Secretary of Transportation shall ensure that an agreement under this subchapter with a State or a political subdivision of a State to allow the State or subdivision to operate an airport facility in the State or subdivision relieves the United States Government from any liability arising out of, or related to, acts or omissions of employees of the State or subdivision in operating the airport facility.

(b) Air traffic control contract program.—

(1) The Secretary shall continue the low

activity (Visual Flight Rules) level I air traffic control tower contract program established under section (a) of this section for towers existing on December 30, 1987, and extend the program to other towers as practicable.

(2) The Secretary may make a contract, on a sole source basis, with a State or political subdivision of a State to allow the State or subdivision to operate an airport traffic control tower classified as a level I (Visual Flight Rules) tower if the Secretary decides that the State or subdivision has the capability to comply with the requirements of this paragraph. The contract shall require that the State or subdivision comply with applicable safety regulations in operating the facility and with applicable competition requirements in making a subcontract to perform work to carry out the contract.

On September 30, 1994, Congress enacted the Department of Transportation and Related Agencies Appropriations Act, 1995, Pub.L. 103–331, 108 Stat. 2471. The House Report to the appropriations bill of the 1995 Act states that the House Appropriations Committee "continues to support the [air traffic control streamlining project]" and that "[i]t is estimated that 25 low-activity air traffic control towers will be contracted out in fiscal year 1994 under this program and an additional 25 will be contracted out in fiscal year 1995." H.R.REP. No. 543(I) at 43 (1994); (AR 613).

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The moving party bears the initial burden of showing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once a properly supported motion is made, the burden shifts to the non-moving party to demonstrate the existence of a material dispute as provided in Rule 56(e):

an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In determining whether there exists a genuine issue of material fact, this court must view the evidence in the light most favorable to the non-moving party. *Adickes*, 398 U.S. at 157; *White v. Turfway Park Racing Ass'n., Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether an issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide whether the evidence is such that "reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict," *id.* 477 U.S. at 252, or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.*

### IV. "Contrary to Law"

■ The FAA need not conduct the A–76 analysis when the analysis is "contrary to law, Executive Orders, or any treaty or international agreement." Circular at ¶ 7(c). Specifically citing the 1982 and 1994 Acts, the FAA alleges that it need not conduct the A–76 analysis "[i]n the face of this congressional mandate" that "such towers can and shall be contracted out." (Def.Mot.S.J. at 12 (doc. # 57)). The Court disagrees.

■ In reviewing an agency's interpretation of a statute which it administers, the Court must first determine if the statute unambiguously addresses the precise question at issue. If so, the Court must give effect to the intent of Congress and the agency's interpretation is irrelevant. If the

statute, however, is ambiguous or silent on the question, then the Court must determine if the agency's interpretation is based on a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If so, then the Court must defer to that interpretation and may not "impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation." *Id.*

An initial agency interpretation is not carved in stone; the agency is free to adapt to changing circumstances, and the Court should defer to the agency's revised interpretation, if the revision is justified with "reasoned analysis." *Rust v. Sullivan,* 500 U.S. 173, 186, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The Court, however, need not defer to positions taken by the agency purely during the course of litigation. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212–13, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (stating that the Court has "never applied the principle of [*Chevron* ] to agency litigating positions that are wholly unsupported by regulations, ruling, or administrative practice.... Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate"); *Franklin Fed. Sav. Bank v. Dir., Off. of Thrift Super.,* 927 F.2d 1332, 1337 (6th Cir.), *cert. denied,* 502 U.S. 937, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991).[6]

The 1982 Act is not ambiguous: It provides that *if* the FAA contracts out a tower to a state or political subdivision, the FAA must enter into an agreement to hold the United States harmless for any accidents which occur at those towers. The Act, however, does not mandate that the FAA contract out at all, and specifically addresses only contracting out towers to either states or political subdivisions, not private contractors. Thus, the Act clearly does not mandate that the FAA privatize FAA-operated Level 1 air traffic control towers.

Because the statute is not ambiguous, the Court need not defer to the FAA's interpretation of the 1982 Act. Even if the 1982 Act were silent or ambiguous on the issue, however, it is clear that at the time the 1982 Act was enacted, the FAA interpreted the 1982 Act to provide it with "contracting authority" which required (as the FAA stated in its 1984 outline of the program) that the FAA conduct an A–76 analysis for FAA-operated towers.

In addition, had the FAA interpreted the 1982 Act as a "mandate", then the FAA would have lacked the authority to cancel the program to contract out Level 1 towers, which it attempted to do in 1986. The 1986 memorandum stating that the program was not currently part of an A–76 effort is entirely consistent with the FAA's interpretation that it was required to conduct an A–76 analysis for FAA-operated towers, because in 1986, the FAA had not yet privatized any FAA-operated towers. The FAA's "revised" interpretation that the 1982 Act is a "mandate" is not entitled to deference, as the agency has provided no citations to the administrative record indicating that it embraced that interpretation prior to the filing of this lawsuit, or that its "revised" interpretation is based on a reasoned analysis.

In 1987, Congress, reacting to the FAA's intent to cancel the program, legislated that the FAA continue with the program instituted under the 1982 Act and expand the program "as practicable". The House Conference Report states that the purpose of the FAA program was to "reinstate service" at airports which were closed due to the 1981 strike, and states that the FAA should extend the program to new towers "determined by the Secretary to qualify for contract operations."

Thus, like the 1982 Act, the 1987 Act is not ambiguous: it does not mandate that the FAA contract out Level 1 FAA-operated towers, but merely states that the FAA shall

---

6. In their summary judgment motions submitted to the Court on May 6, 1997, neither the plaintiffs nor the defendants cited *any* cases in support of their respective arguments that Congress did/did not "mandate" that the FAA contract out Level 1 towers. Thus, the parties did not argue under *Chevron* either that the various Acts were or were not ambiguous, or that deference to the FAA, pursuant to *Rust* and *Bowen*, was necessary.

continue with the program instituted under the 1982 Act, (1) that explicitly referred only to contracts made with states or political subdivisions; and (2) that the FAA in 1984 interpreted as requiring an A–76 analysis for FAA-operated towers; and (3) that the FAA stated in 1992 did not impact, at that time, FAA-operated towers. Even if the 1987 Act were ambiguous or silent on the issue, however, the FAA has provided no citations to the administrative record indicating that it embraced the 1987 Act as a "mandate" prior to the filing of this lawsuit.

Like the 1982 and 1987 Acts, the 1992 Act is also not ambiguous: it states only that the FAA may contract Level 1 VFR towers to states or political subdivisions. Even if the 1992 Act were ambiguous or silent on the issue, however, the FAA has provided no citations to the administrative record indicating it embraced the 1992 Act as a mandate prior to the filing of this lawsuit.

In 1993 Vice–President Gore in the NPR, and Congress in its Committee Report to the bill of the 1994 Appropriations Act, approved the contracting out of FAA-operated Level 1 towers. The defendants, however, have not provided any authority to the United States Code, nor do they argue, that the NPR is "law".

■ Moreover, like the 1982, 1987, and 1992 Acts, the 1994 Act does not "mandate" that the FAA privatize FAA-operated Level 1 towers. Indeed, the 1994 Act never mentions the privatization program. Instead, the program is mentioned only in the Committee Report to the Act. Committee Report language accompanying an appropriations bill, however, does not establish legal requirements for an agency, even though the agency's decision to ignore that legislative history could have "grave political consequences". *Lincoln v. Vigil,* 508 U.S. 182, 192, 193, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993); *see also American Hosp. Assn. v. NLRB,* 499 U.S. 606, 616, 111 S.Ct. 1539, 113 L.Ed.2d 675

(1991) (holding that statements in committee reports do not have the force of law). In addition, although Congress may amend substantive law in an appropriations statute if it does so clearly, Congress did not do so here, where it does not even mention the privatization program in the text of the 1994 Act; nor does the FAA argue that it did. *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 440, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992).

It is clear that the FAA understood that neither the NPR nor the 1994 Act excused compliance with the Circular: it stated in its January, 1994, waiver of the cost-comparison study, that the contracting out program "may become law"; and stated in a March, 1994, memorandum, that irrespective of the NPR and the 1994 Act, it was required to conduct the A–76 analysis. Thus, even if the 1994 Act were to require deference to the FAA, the FAA has provided no citations to the administrative record indicating that it embraced its current interpretation of the 1994 Act prior to the filing of this lawsuit, or that this "revised" interpretation is based on "reasoned analysis." [7]

Finally, because 49 U.S.C. § 47124 merely incorporates the 1982, 1987, and 1992 Acts, it is also not a "mandate" to contract out FAA-operated Level 1 VFR towers. Even if that statute were to require deference to the FAA, however, the FAA has provided no citations to the administrative record indicating that it embraced its current interpretation of the statute prior to the filing of this lawsuit.

Accordingly, neither the 1982, 1987, 1992, 1994 Acts, nor 49 U.S.C. § 47124, "mandated" that the FAA privatize FAA-operated Level 1 towers. It follows that the FAA, therefore, was required to conduct the A–76 analysis prior to privatizing those towers.

### V. Remand

■ The FAA concedes that it did not comply with the Circular and did not determine whether operation of an FAA-operated

---

7. Defendants argue that the execution of this waiver "does not contradict the agency's position" that it was not required to conduct an A–76 analysis, because it executed this waiver not because it felt that compliance with the Circular was necessary, but only *"in the event* that there

was any dispute over its application." (Def.Reply at 7 (doc. # 61)). Defendants have not reconciled this, however, with the statement that the privatization program "may become law", or Nicholas Stoer's March, 1994, statement that the FAA was required to conduct the A–76 analysis.

Level 1 air traffic control tower is an inherently governmental activity. It alleges, however, that (1) Level 1 air traffic is not an inherently governmental function; (2) Congress, by endorsing the program, has determined that the privatization of Level 1 air traffic does not impair the national defense and that the Department of Defense approved that decision; (3) commercial sources to perform Level 1 air traffic were available; (4) the FAA could not expect to win the price competition; (5) the FAA properly waived the cost-comparison study; and (6) the FAA did not act in bad faith.

The procedures established by the Circular and its Supplement, however, delineate that the agency shall not conduct a cost-comparison study or waive that study until the agency has determined that the function is not inherently governmental. Supp. at 1–6. Therefore, even if the FAA "waived" the study, it should not have done so prior to determining whether operating a Level I air traffic control tower is an inherently governmental function.

This Court previously stated in its *Memorandum and Order* of January 16, 1997, that if it determined that the FAA is required to conduct the A–76 analysis, "the proper course at that time will be to remand to the agency for such consideration." *Id.* at 5. The United States Supreme Court has stated:

> if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is generally not empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

Plaintiffs, however, argue that the Court should conduct the A–76 analysis. Specifically, they move the Court to determine that Level 1 air traffic is an inherently governmental function, that privatization impairs the national defense, and that the agency

improperly waived the study; they allege that the FAA cannot be trusted to conduct an impartial analysis because the FAA allegedly has acted in bad faith, preordaining any outcome on remand.

Plaintiffs cite a few cases that have held that a court need not remand to an agency when: (1) although the agency failed to abide by the proper procedures of the APA, it arrived at its conclusion in another manner which was valid under the APA, *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); or (2) even if the agency did not abide by the proper regulations, the agency took corrective action, making remand meaningless, *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484 (D.C.Cir.1995) (holding that remand was meaningless on one issue, but still remanding the case to the agency on another issue); or (3) plaintiffs conceded the issue to be decided on remand, *Amer. Train Dispatchers Ass'n v. ICC,* 26 F.3d 1157 (D.C.Cir.1994); or (4) although the agency stated erroneous legal reasons for its conclusion, the agency's conclusion was "the only possible legal result", as dictated by statute and/or Supreme Court precedent, *Motion Picture Ass'n of America v. Oman,* 969 F.2d 1154, 1158 (D.C.Cir.1992). None of these situations is applicable here.

Plaintiffs also cite *Diebold v. United States,* 947 F.2d 787 (6th Cir.1991), *reh'g denied,* 961 F.2d 97 (6th Cir.1992). In *Diebold,* the Sixth Circuit held that a court may review an agency's privatization decision made pursuant to the Circular. *Diebold* did not hold, however, that a court must perform the Circular analysis de novo, contrary to *Florida Power & Light,* if the agency has failed to do so. Plaintiffs also argue that defendants have waived the issue of remand by not addressing it in their May 6, 1997, summary judgment motion. The Court still may consider this argument, however, as the Court addressed it in its Order of January 16, 1997, and the plaintiffs raised this issue in their summary judgment motion.

Accordingly, this Court vacates the FAA's privatization program for FAA-operated Level 1 towers and remands this case to the FAA to undergo the proper analysis required

by the Circular. *See Cissell Mfg. Co. v. U.S. Dept. of Labor,* 101 F.3d 1132, 1136 (6th Cir.1996) (reversing a district court's decision to not remand a case to an agency where the agency committed an error of law, stating "[i]t is well settled that when an agency makes an error of law ... a reviewing court should remand the case to the agency so that the agency may take further action consistent with the correct legal standards"); *Coal Exporters Ass'n v. United States,* 745 F.2d 76, 80, 99 (D.C.Cir.1984) (vacating and remanding a decision of the Interstate Commerce Commission found to reflect an unreasonable interpretation of a statute).[8]

## VI. Appeal

■ The Sixth Circuit has jurisdiction over "final decisions" of a district court, pursuant to 28 U.S.C. § 1291. Generally, however, an order of a district court remanding a case to an agency for further proceedings is not a final decision. *Schuck v. Frank,* 27 F.3d 194, 196 (6th Cir.1994). The Sixth Circuit has held, however, that a decision of a district court to remand a case to an agency is appealable if a party "would not be able to challenge the *legal basis* for the remand if appellate review was denied." *Schuck,* 27 F.3d at 196.

The *Schuck* Court cited with approval *Occidental Petroleum Corp. v. SEC,* 873 F.2d 325 (D.C.Cir.1989). In that case, Occidental sought to prevent the SEC from releasing certain documents. The district court found that the administrative record was inadequate for judicial review and remanded the case to the SEC for further proceedings. The SEC appealed, arguing that the district courts' order required it to follow procedures on remand not required by law. The *Occidental* Court held that the district court's order was appealable, stating:

> [Because of an] agency's inability to pursue an appeal from its own later decision... when a district court directs an agency to proceed under a certain legal standard, the agency has no choice but to conduct its proceedings and to render its decision pursuant to that standard. Unless another party appeals the decision, the correctness of the district court's legal ruling will never be reviewed by the court of appeals, notwithstanding the agency's conviction that the ruling is erroneous.

*Id.* 873 F.2d at 330. Like the SEC in *Occidental,* the FAA will be unable to appeal its own decision upon remand. Thus, the FAA will be unable to seek review of this Court's decision requiring it to conduct the A-76 analysis, unless the plaintiffs later choose to appeal. Accordingly, this Court finds that this Order is appealable.

## VII.

This Court denies the plaintiffs' summary judgment in part, and grants it in part (doc. # 56, 59). This Court also denies the defendants' summary judgment motion (doc. # 57). The FAA's privatization decision for FAA-operated Level 1 towers is vacated and this case is remanded to the FAA for proceedings consistent with this opinion. The defendants' motion to strike the plaintiffs' supplemental affidavit (doc. # 65) is denied as moot.

---

8. Defendants argue that the Court cannot "undo four years of implementation" of the program because the plaintiffs failed to seek a stay prior to filing its complaint in this Court. In support of its argument, defendants cite only one case, *Duncan v. Farm Credit Bank,* 940 F.2d 1099 (7th Cir.1991). In that case plaintiffs defaulted on a loan, and the bank foreclosed on the property. The bank offered to allow the plaintiffs to purchase the property, and also negotiated with other bidders. Plaintiffs sued, arguing that the bank violated a statute which granted them the right of first refusal to repurchase the foreclosed property. The district court dismissed the case, and the plaintiffs never sought a stay of the bank's sale to the higher bidder pending appeal. The bank sold the property during the appeal, and the Seventh Circuit Court of Appeals dismissed the case as moot.

Unlike *Duncan,* this case is not moot, because even if the FAA has privatized most of the Level I towers, the contracts made are for only one year periods, with options to renew. In addition, *Duncan* is not on point, because it did not concern the Administrative Procedure Act, and the government has not cited any cases refuting the argument in *Coal Exporters* that, after finding that an agency incorrectly interpreted a statute, a Court should vacate the agency's decision and remand the case to the agency. In fact, the FAA has argued that, if this Court finds that the agency was required to comply with the Circular, remand is this Court's "only option." (Def. Reply at 5 (doc. # 61)).

This order is final and appealable.

IT IS SO ORDERED.